THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CHUCK GARD, Defendant-Appellant.

Fifth District No. 5—91—0541

Opinion filed October 29, 1992.

W. LEWIS, J., specially concurring.
CHAPMAN, J., dissenting.

Daniel M. Kirwan and Michelle A. Zalisko, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Michael Kiley, State's Attorney, of Shelbyville (Norbert J. Goetten, Stephen E. Norris, and Kendra S. Mitchell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:
Defendant, Chuck Gard, appeals from his convictions on two counts of arson. He was tried before a jury in the circuit court of Shelby County on May 6-8, 1991. On June 26, 1991, defendant was sentenced to serve two concurrent terms of four years' imprisonment, and judgment was entered on the convictions. Defendant raises three issues on appeal: (1) whether it was reversible error for both the prosecutor and defense counsel to repeatedly refer to the fact that poly-

graph examinations had been given to two witnesses, Diana King and John Clutter; (2) whether one of defendant's convictions must be vacated because both convictions are based on a single act; and (3) whether the defendant's sentence of fours years' imprisonment is excessive and must be reduced in light of his potential for rehabilitation and in light of his codefendant's lesser sentence. For the reasons which follow, we affirm defendant's convictions and sentences.

Defendant, along with his codefendant, Diana King, was charged, by information filed in the circuit court of Shelby County on September 7, 1991, with two counts of arson in that, on or about July 31, 1990, he did, (1) by means of fire, knowingly damage a building without the owners' consent, and (2) by means of fire, and with the intent to defraud an insurer, knowingly damage a building. We will summarize the evidence presented at defendant's jury trial to the extent it is necessary to resolve the issues before us on appeal.

The owner of the damaged building, David Eberspacher, testified that he did not give anyone permission to damage the building by fire. The building was insured by Cincinnati Insurance Company. The building contained several offices on lease, including a portion of the building leased by Diana King and used by her as a music store known as Music Mountain. The building owners did not provide for insurance on the contents of the building. Access to the basement of the building could be gained from a manhole and a grate both located in the sidewalk in front of the building. The defendant was not a party to any lease of the building.

Insurance agent Richard Firnhaber represents Cincinnati Insurance Company, which had a fire and liability insurance policy on the business of Diana King known as Music Mountain. The policy insured only the contents of the business against fire. Diana King provided Firnhaber with a list of contents that had been destroyed in the fire. The amount of the insurance on the contents of the building was $20,000. The amount of the claim submitted was $17,438. Defendant is not a beneficiary of any insurance policy covering Music Mountain.

Michael Macklin can see the Music Mountain store from the window of his residence. At approximately midnight on July 28, 1990, he was up late watching television. He heard a noise outside, and when he looked out his window, he observed Diana King and her boy friend moving furniture into the back of a truck. He identified defendant as the boy friend. At approximately 3:30 on the morning of July 31, 1990, Macklin was awakened and told to evacuate his residence as the building across the street was on fire.

Diana King testified that she was 30 years of age and had been romantically involved with the defendant. They met in June 1990, and she began living with him in July 1990. King was the owner of Music Mountain, a music store that sold cassettes and related items. She had started the business in December 1989. In June and July 1990, business was very bad, and King thought about burning the business and collecting the insurance money in order to get out of it.

Approximately one week before the fire, King discussed with defendant her idea of burning the building. They discussed collecting the insurance money, paying off their debts and purchasing a Harley Davidson motorcycle. They went so far as to pick out the motorcycle they wanted. They later discussed it again and decided to do it. On the Saturday before the fire, King and defendant placed a faulty extension cord on some flammable materials in hopes it would start a fire. Also present was John Clutter, an employee of the store who also resided with King and defendant. They left the store. No fire occurred. They returned to the store on Monday, and after they left, defendant told King that he had placed a cigarette in a chair. On Monday night, when they realized again that no fire had started, defendant suggested that they go back that night and start one. King and defendant returned to the store at approximately 1:30 a.m. They planned to make it look as if a burglary had occurred. King took tapes and other items from the store, including the money from the cash register. Defendant kicked the basement door in to make it appear that someone had entered the store from the basement. However, he kicked it from the wrong side. Defendant then set a chair on fire with his cigarette lighter. They returned home.

The police informed them of the fire at approximately 9 a.m. King later told John Clutter that she and defendant had started the fire. King submitted a claim in the approximate amount of $17,000 to her insurance company. Defendant knew that she was planning to do this.

King was interviewed by the police three different times. When asked in direct examination who was present for the second interview, King responded, "Mr. Marlow and the man that gave the lie detector test." She denied any involvement in the fire. On September 7, 1990, King confessed to the police, and she was placed under arrest. King had pleaded guilty to two counts of arson but had not yet been sentenced at the time of defendant's trial. The State had agreed to recommend a three-year prison term in return for King's guilty plea.

In cross-examination, in establishing the chronology of the various interviews King had with the police, she mentioned a lie detector test. Nothing King said during the lie detector test was revealed in testi-

mony, nor was the result of that test revealed in testimony. King also testified that John Clutter had taken a lie detector test, but she did not describe the results of that test or any statements made by Clutter during the test.

John Clutter was called to testify. He was 20 years of age at the time of trial. He worked at Music Mountain. In July 1990, King began joking about burning the business. On July 28, 1990, Clutter observed defendant place a faulty extension cord on top of some flammable materials. Clutter was residing with King and defendant. Clutter learned of the fire at noon on July 31, 1990. That day, defendant told Clutter that the extension cord had not worked and that he had started the fire with a cigarette lighter. The prosecutor asked Clutter whether he had been asked to take a lie detector test, and Clutter responded affirmatively. Defendant told Clutter that the tests were easy to beat and told him how to do it. Clutter was promised a leather jacket by King if he passed the test. Clutter was also given a guitar by King and defendant because they did not want it to burn in the fire. King removed many tapes from the store prior to the fire and brought them to defendant's residence.

On cross-examination, defense counsel inquired of Clutter regarding his polygraph examination. Clutter admitted having taken the exam and testified that the examiner told him he had failed. Clutter testified that he had stated during the examination that he knew nothing about the fire. After he was told he failed the polygraph examination, Clutter admitted his knowledge regarding the fire.

Donald Tankersly is an arson investigator with the office of the State Fire Marshall. He investigated the fire of Music Mountain. He determined that the fire began in an overstuffed chair and had burned for approximately 30 minutes before being reported. The basement door had been forced open. Tankersly participated in an interview of defendant in which defendant admitted his complicity in the fire. Defendant stated that he and King had started the fire in order to collect insurance money. Defendant admitted having kicked the basement door open and setting the overstuffed chair on fire.

Jeff Marlow, special agent with the Illinois State Police, Division of Criminal Investigation, testified that he participated in the interview of defendant in which defendant admitted his involvement in the fire. Defendant had been involved in a romantic relationship with Diana King for approximately two months prior to the fire. On July 28, 1990, pursuant to discussions he had had with King, defendant decided to try to burn the store in order to collect insurance money. At approximately 1:30 a.m. on July 31, 1990, King and defendant went

to the store, and using a cigarette lighter, defendant set the over-stuffed chair on fire. Defendant also stated that he kicked the basement door open. King removed several cassette tapes from the store and took them to defendant's residence. A guitar had been given to John Clutter on July 28. The State rested.

The defense called Timothy McClain, a Shelbyville police officer, who testified that he discovered the fire and reported it between 3:40 and 3:55 a.m.

The defense called John Clutter and asked him whether he had taken a polygraph examination. Clutter responded affirmatively. The examination of Clutter consisted of attempts to impeach him. Donald Tankersly was called by the defense in an attempt to establish impeachment of Clutter's testimony.

Christina Punches testified that she had known Diana King for one year. King had worked for Punches in her tavern. Approximately three months prior to the fire, King told Punches that if Punches could find someone to "torch" the Music Mountain store, King would split the insurance proceeds with her. King brought this subject up often with Punches.

The defense called Jeff Marlow in an attempt to impeach the testimony of John Clutter and to impeach Marlow's testimony given in the State's case in chief.

Finally, the defense called Diana King to testify that the idea of the arson originated with her and that she had told Marlow in one of her interviews with him that she had actually set the fire. On cross-examination by the State, she indicated that she also told Marlow that defendant was with her when she set the fire and that defendant kicked in the basement door. King testified that she did not actually set the fire.

The defense rested and the State presented no rebuttal evidence. Following closing arguments and instructions, the jury returned verdicts of guilty on both counts.

The defendant's first argument on appeal is that he was prejudiced by repeated references by both the prosecutor and defense counsel to the fact that State witnesses Diana King and John Clutter had been given polygraph examinations and that his convictions must therefore be reversed. Relying on *People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070, defendant argues that testimony concerning whether King and Clutter had taken polygraph examinations was inadmissible, even if defendant agreed to the submission of that evidence, because of the inherent unreliability of the polygraph test. Defendant further argues that because the admission of such evidence

fundamentally impinges on a defendant's right to a fair trial, it constitutes reviewable plain error even where defendant fails to object to the evidence. Furthermore, defendant argues, his counsel's failure to object to admission of the evidence either at trial or in a post-trial motion rendered his assistance ineffective, depriving defendant of his constitutional right to the effective assistance of counsel.

■ In *Baynes*, our supreme court held that the admission of evidence that a *defendant* has taken a polygraph examination constitutes plain error because it impinges upon the integrity of our judicial system. This is true even where the parties stipulate to the admission of the evidence. Polygraph evidence is not reliable enough to be admitted into evidence, and its prejudicial effect substantially outweighs its probative value because no other form of evidence is as likely to be considered as completely determinative of guilt or innocence as a polygraph examination. In *Baynes*, evidence was admitted that the defendant had submitted to a polygraph examination, that certain specified questions had been asked of defendant, and that defendant's answers, which were revealed, were not truthful.

Indeed, it has been held that not only are the results of a defendant's polygraph examination inadmissible at his trial but any reference in a criminal trial to the fact that a polygraph examination was offered to, or refused by, a *defendant* constitutes error. (*People v. Eickhoff* (1984), 129 Ill. App. 3d 99, 102-03, 471 N.E.2d 1066, 1068.) In *Eickhoff*, the court stated,

"Testimony that a defendant was offered a polygraph test, or that he refused one, interjects into the case inferences which bear directly on his guilt or innocence: either he failed the test—as the State presumably would not pursue charges against an innocent—or he refused to submit to testing in fear that his guilt would be shown. That which may not be accomplished directly by evidence of polygraph test *results* may not be accomplished indirectly by references to whether a defendant sought, declined, or was offered a polygraph test." (Emphasis in original.) 129 Ill. App. 3d at 103, 471 N.E.2d at 1069.

Finally, use of polygraph evidence with respect to a *defendant* in a criminal trial constitutes reversible error regardless of the weight of the other evidence because it necessarily interferes with the integrity of the judicial process. It can never constitute harmless error. *People v. Thomas* (1984), 123 Ill. App. 3d 857, 867, 463 N.E.2d 832, 840.

However, it has been held that the same general rules do not apply when the polygraph examination in question was given to a *witness* rather than to the defendant. (*People v. Parisie* (1972), 5 Ill.

App. 3d 1009, 287 N.E.2d 310.) While we find no case precisely on point factually with the one at bar, we are able to distill from those cases which have addressed polygraph examination evidence with respect to witnesses a rule of law to apply to the case at bar.

In *Parisie*, a State's rebuttal witness testified that he had taken a polygraph test at the request of the State. He did not testify to the result of the test, but it was established that the witness had also been investigated in connection with the crime. The court struck the witness' testimony with regard to the polygraph exam.

 Recognizing the general rule that admission of polygraph evidence with respect to a defendant constitutes reversible error, the court stated that it was aware of no authority holding that testimony by a *witness* that he had submitted to a polygraph test is so prejudicial to the defendant that reversible error has been committed. The testimony regarding the taking of the polygraph test was purely with reference to the witness and not the defendant. It did not go to any material issue as to defendant's guilt or innocence of the offense. Because the court had sustained the objection to the witness' answer that he had taken a polygraph test and instructed the jury to disregard the testimony, any error was harmless and not of sufficient prejudice to defendant to be reversible.

In *People v. Martin* (1965), 62 Ill. App. 2d 203, 210 N.E.2d 798, *aff'd* (1966), 35 Ill. 2d 289, 220 N.E.2d 170, testimony that a witness had taken a lie detector test was held properly admitted; there were no statements about the results of the test. Because the testimony was only about the fact that the test was taken and not the result of the test, it did not raise any issue as to the reliability of the lie detector test. Therefore, its exclusion was not justified. In that case, the witness testified that he had lied in his first interview with the police but told the truth in his second interview, after he had taken the lie detector test.

It has been held, however, that it is prejudicial error to admit evidence that *complaining* witnesses in a sexual abuse case had submitted to polygraph examinations even where the results of the tests are not admitted. (*People v. York* (1975), 29 Ill. App. 3d 113, 120, 329 N.E.2d 845, 850.) Any evidence of the veracity of the complaining witnesses about the charges lodged against defendant was clearly prejudicial to defendant. Even though the results of the tests were not admitted, the obvious implication was that had the results been negative, the case would not have been prosecuted.

In *People v. Rutledge* (1977), 45 Ill. App. 3d 779, 782, 359 N.E.2d 1233, 1235, the prosecutor asked a witness whether he had been of-

fered a polygraph examination. An objection was sustained before the witness could answer. Although the issue was not raised in defendant's post-trial motion, the court held that the alleged error came within the plain error rule in part because of the closeness of the case against the defendant and the significance of the witness' testimony. The court then pointed out that although the rule excluding evidence of polygraph examinations of the defendant does not necessarily apply to a polygraph examination of a witness, the rationale found in those decisions is equally applicable with respect to a witness. Thus, the question asked of the witness was improper, and the trial court properly sustained defendant's objection. Furthermore, because the testimony of the witness was a significant factor in establishing the defendant's alibi defense, any questions importing lack of truthfulness to the witness were particularly prejudicial to the defense. Because of the prejudicial effect of several trial errors, defendant's conviction was reversed and the cause was remanded for a new trial.

In *People v. Poliquin* (1981) 97 Ill. App. 3d 122, 132, 421 N.E.2d 1362, 1370, a police officer testified that a coconspirator of defendant's had been given a lie detector test. This coconspirator did not testify at trial. The court held that testimony that the coconspirator had taken the examination did not mean defendant had either taken or failed the test. The coconspirator did not testify at defendant's trial, and therefore her credibility was not in issue. The fact that the coconspirator had taken a polygraph examination had no relation to or bearing upon the guilt or innocence of defendant. Finally, the court held that even if admission of the evidence in question constituted error, the strength of the evidence adduced by the State rendered the error harmless.

In *People v. Mack* (1982), 107 Ill. App. 3d 164, 437 N.E.2d 396, the admission of evidence that certain State witnesses may have taken polygraph examinations prior to testifying at defendant's trial was held not to be reversible error where there was no showing that any particular witness took such a test, the results of the test were not presented, and the jury was instructed to disregard any reference to the tests.

Finally, in *People v. Escobar* (1988), 168 Ill. App. 3d 30, 43, 522 N.E.2d 191, 200, a witness, in recounting the events of the day that he was questioned by police, included a brief reference to taking a polygraph examination. Because this testimony was elicited by defense counsel, the court on appeal found no error. However, the prosecutor mentioned this testimony in his closing argument. The court reviewed the claim of error under the plain error rule although de-

fense counsel did not object to the prosecutor's argument, but the court found that the strength of the State's evidence rendered harmless the prosecutor's erroneous remark.

In all of these cases, only the fact that the witness had taken a polygraph examination was admitted into evidence; there was no evidence of the result of the exam. From these cases, it appears that while admission of such evidence constitutes error, and even plain error, it does not necessarily constitute reversible error. The crucial factor in determining the prejudice to the defendant seems to be the importance of the witness' testimony and the extent to which the credibility and testimony of that witness reflect on the issue of defendant's guilt or innocence.

Thus, in *York*, where the witnesses who had submitted to the polygraph examination were the complaining witnesses in a case against defendant charging sexual abuse (incest), a case where the question of guilt or innocence often and almost inherently turns on the credibility of the complaining witness versus that of the defendant, admission of evidence that the complaining witnesses had taken a polygraph examination before charges were filed strongly reflects on the question of the defendant's guilt or innocence, even where the results of those tests are not admitted into evidence. On the other hand, in a case such as *Poliquin*, where the reference to the polygraph examination concerned a coconspirator who did not even testify at defendant's trial, the fact that a polygraph exam was administered did not in any way reflect on the guilt or innocence of the defendant. Thus, reference to the polygraph examination was not prejudicial error. In *Rutledge*, the testimony of the witness who had submitted to the polygraph examination was a significant factor in establishing the defendant's defense. Thus, the court found that any evidence casting doubt on the credibility of this witness, such as that he had refused to submit to a polygraph examination, was highly prejudicial to the defense.

Also to be considered in determining the amount of prejudice to defendant is the strength of the evidence against him. See *Poliquin*, 97 Ill. App. 3d 122, 421 N.E.2d 1362; *Escobar*, 168 Ill. App. 3d 30, 522 N.E.2d 191; *Rutledge*, 45 Ill. App. 3d 779, 359 N.E.2d 1233.

In the instant case, there is no doubt that witnesses King and Clutter were important State witnesses. Both strongly implicated defendant in the crime. Nothing said by King during her examination was revealed, nor was the result of that examination revealed; only the fact that she had taken the test was revealed. Witness Clutter did testify that the polygraph examiner told him that he had failed the

test. Clutter also testified that he had stated during the examination that he knew nothing about the fire but then admitted his knowledge after being told he had failed the test. This evidence, however, was elicited by defense counsel in cross-examination of Clutter.

■ We think that the admission of this evidence did constitute error in defendant's trial. Although defendant did not object to the admission of this evidence at trial or in his post-trial motion and in fact elicited the most damaging evidence at trial, we choose to review the alleged error under the plain error rule. As our supreme court pointed out in *Baynes*, the nature of polygraph evidence poses a threat to the integrity of our judicial system. It is not reliable enough to be admitted into evidence and is given undue weight by a jury. (*Baynes*, 88 Ill. 2d at 244, 430 N.E.2d at 1079.) One of the purposes of the plain error rule is to protect and preserve the integrity and reputation of the judicial process. (*Baynes*, 88 Ill. 2d at 231, 430 N.E.2d at 1072.) Thus, we will review the erroneous admission of the polygraph evidence in the case at bar to determine whether it so prejudiced defendant as to require reversal of his conviction and remandment for a new trial.

■ Because witnesses King and Clutter strongly implicated defendant in the crime, the issue of their credibility is an important one. However, they are not the complaining witnesses, as in *York*. Furthermore, with respect to King, neither the result of her examination nor her statements during that examination were admitted into evidence. The mere fact that a noncomplaining witness took a polygraph examination, where neither the result nor the substance of that examination is in evidence, does not directly reflect on the guilt or innocence of the defendant. Nor does the fact that King was a codefendant lend prejudicial effect to the evidence that she had submitted to a polygraph examination. She had already pled guilty to the same offenses with which defendant was charged. This is not a case where the jury could draw the inference that King was not being prosecuted because she had passed a polygraph examination indicating she was innocent but defendant was guilty. The mere fact that King took a polygraph examination, where neither the result nor the substance of that examination is in evidence, does not tend to enhance or destroy her credibility. Thus, we do not believe that defendant was prejudiced by the admission of evidence that King had submitted to a polygraph examination.

With respect to Clutter, we think that his testimony that he failed the examination when he denied any knowledge of the fire does tend to enhance his credibility with respect to his knowledge of the fire.

However, it does not necessarily reflect on the guilt or innocence of the defendant. It only tended to show that Clutter had some knowledge, not that the defendant was guilty or innocent. To the extent it does enhance Clutter's credibility, we do not think it prejudices defendant so as to deprive him of a fair trial. The evidence of defendant's guilt was substantial, even overwhelming, even without considering the testimony of Clutter. Defendant had confessed his complicity to the police, and this confession was admitted into evidence. The circumstantial evidence, as well as King's testimony, implicates defendant. We find that defendant was not prejudiced by the admission of the polygraph examination evidence with respect to King and Clutter such that he was deprived of a fair trial. Accordingly, we will not reverse his convictions on this ground.

Because we find that defendant was not prejudiced by the error, we also reject his claim of ineffective assistance of counsel based on his counsel's failure to object, either at trial or in a post-trial motion, to the admission of the polygraph examination evidence. See *People v. Albanese* (1984), 104 Ill. 2d 504, 527, 473 N.E.2d 1246, 1256.

Defendant's second argument on appeal is that one of his convictions must be vacated as both are based on the same, single act. Defendant was charged and convicted under subsections (a) and (b) of section 20–1 of the Criminal Code of 1961. (Ill. Rev. Stat. 1989, ch. 38, pars. 20–1(a), (b).) That section provides in pertinent part as follows:

"A person commits arson when, by means of fire or explosive, he knowingly:

(a) Damages any real property, or any personal property having a value of $150 or more, of another without his consent; or

(b) With intent to defraud an insurer, damages any property or any personal property having a value of $150 or more." (Ill. Rev. Stat. 1989, ch. 38, par. 20–1.)

Arson is a Class 2 felony. The jury returned verdicts of guilty on both counts of the information, and judgment and sentence were entered on both counts of the information.

██ Defendant argues on appeal that one of the convictions must be vacated because both counts were based on a single act. Under *People v. King* (1977), 66 Ill. 2d 551, 565, 363 N.E.2d 838, 844, prejudice results to a defendant where more than one offense is carved from the same physical act. There was only one fire in the instant case, and although defendant was charged with setting that fire with two separate intents, both counts were based on the same physical act

of setting fire to a chair. Thus, defendant argues, only one arson occurred, and defendant's conviction and sentence for arson based on intent to defraud the insurance company must be vacated.

The State responds that multiple convictions based upon the same physical act are justified where there is more than one victim. In the instant case, there are two victims—the building owners and the insurance company which insured the contents of the Music Mountain store—and therefore two convictions and sentences are justified. We find that we must agree with the State.

The defendant is correct that multiple convictions may not be based on the same physical act, at least where only one victim is concerned. The cases relied upon by defendant all involve a single physical act and a single victim. *People v. Cox* (1972), 53 Ill. 2d 101, 291 N.E.2d 1, involved two counts of indecent liberties (sexual intercourse and oral/genital contact) against the same victim committed in a single course of conduct. In that case, the court held that one of the convictions must be vacated because both were based on the same act. *People v. Bridges* (1989), 188 Ill. App. 3d 961, 545 N.E.2d 367, involved two counts of aggravated battery (against a police officer and causing great bodily harm) against the same victim committed in a single course of conduct. Again, the court held that one of the convictions must be vacated. *People v. Clerk* (1979), 68 Ill. App. 3d 1021, 386 N.E.2d 630, involved two counts of burglary (with intent to commit theft and with intent to commit rape) of the same building committed in a single course of conduct. The court held that only one conviction for burglary could stand. We do not quarrel with the holdings of any of these cases, but we find that they are inapposite to the case at bar, where there are two victims injured by the same physical act.

We find the cases cited by the State to be controlling of the case at bar. In *People v. Butler* (1976), 64 Ill. 2d 485, 356 N.E.2d 330, two armed robbery convictions were allowed to stand where, although there was only a single transaction, the armed robbery involved two victims.

In *People v. Grover* (1981), 93 Ill. App. 3d 877, 417 N.E.2d 1093, defendant was convicted of three counts of reckless conduct based upon a car accident in which three separate victims were injured. In that case, defendant argued that he could be convicted of only one offense because there was a single act of driving. The court rejected defendant's argument, finding that the rationale of *People v. King* was inapposite as it was directed and limited to acts committed to a single victim. Thus, more than one offense may exist where multiple victims are injured by a single act. Quoting *People v. Ellington* (1972),

7 Ill. App. 3d 72, 73, 286 N.E.2d 367, 368, the court held that, where two or more persons are injured as a result of a single act, since the consequences affect, separately, each person injured, there is a corresponding number of distinct offenses for which an accused may be convicted. (*Grover*, 93 Ill. App. 3d at 880, 417 N.E.2d at 1096.) In *People v. Davis* (1982), 105 Ill. App. 3d 129, 135, 434 N.E.2d 13, 17, the court held that separate victims require separate sentences, even though there was only one physical act committed by defendant.

■ The arson statute provides for two different forms of arson, one which injures the building owner and another which injures an insurance company. The statute is thus intended to protect two different victims, and where, by setting a fire, a defendant injures both victims, we find that he may be charged, convicted and sentenced for two separate offenses. We find nothing in the language of the arson statute itself which leads to a different conclusion.

We are not unaware of the decision in *People v. Bostick* (1978), 60 Ill. App. 3d 581, 377 N.E.2d 146, which held that, where a defendant was charged with arson under both subsections (a) and (b) of the arson statute based upon a single act of setting one fire, as in the instant case, only one conviction could stand. The *Bostick* court held that, under *People v. King*, more than one offense may not be carved out of a single physical act. However, the court in *Bostick* did not discuss the *Butler* case, in which it was held that more than one offense may be carved from a single physical act where more than one victim is injured by that act. Thus, we decline to follow the holding in *Bostick*, finding it to be contrary to existing law and incorrect in its holding.

Because we find multiple victims in the instant case, we uphold both of defendant's convictions for arson based on the single act of setting fire to the Music Mountain store.

Defendant's final argument on appeal is that his sentences of four years' incarceration are excessive in light of his potential for rehabilitation and in light of his codefendant's lesser sentence. Defendant's sentencing hearing was held on June 26, 1991. The court received and considered a presentence investigation report prepared by the probation department. That report indicates that defendant is 32 years of age and has been married to Beth since 1979. They were separated from June to December 1990. They have three children, ages 11, 9 and 4 years. Defendant has a GED and is employed as a carpet installer earning $5.50 per hour. Beth is unemployed. Defendant's criminal record consists of convictions for violation of curfew, unlawful possession of cannabis and deceptive practice. Defendant's codefend-

ant, Diana King, was sentenced to three years' imprisonment and ordered to pay restitution in the sum of $1,000.

The State presented no evidence in aggravation. Defendant presented evidence in mitigation. Bruce Szachnitowski testified that he has known defendant for 3½ years. Defendant appears to be a good father to his children and spends more time with the children than their mother does. The witness has never known defendant to be violent or unruly. Defendant has been working hard at renovating his home.

Gerald Marsland testified that he employs defendant as a carpet installer. He and defendant are neighbors and have been good friends for five to six years. Defendant has been a good neighbor and friend. Defendant is also a good employee and may continue to work for Marsland if he remains in the community. Defendant is a good family man.

Defendant's wife, Beth, testified that she and defendant have been married 12 years. During their separation, defendant retained custody of the children because he is the more stable parent. Defendant is a good father, and his removal from the family will create emotional and financial difficulties. Defendant has been renovating their home, and the work is not yet completed. Beth needs defendant at home to help with work around the house.

Defendant's mother, Beverly Robison, testified that defendant is a good father and cared for the children when their mother was unable or unwilling. Defendant has been working hard at renovating his home.

Defendant testified in his own behalf that he was remorseful over the crime, accepted the verdict of the jury, and would never repeat the crime. Defendant would comply with the terms of probation.

The State argued that defendant was the prime motivator behind the crime, that his actions caused and threatened serious harm, that unlike his codefendant, King, defendant does have a history of criminality, and that a sentence of imprisonment is necessary to deter others from committing the same offense. Because King had cooperated with the State, the State recommended for her a sentence of three years' imprisonment. With respect to defendant, the State recommended a sentence of four years' imprisonment and restitution.

Defendant argued that he should not receive a greater sentence than his codefendant simply because he had exercised his right to trial. Diana King was at least as culpable as defendant. Furthermore, defendant is the primary supporter of his family. Defendant should re-

ceive a lesser sentence than his codefendant. Defendant asked that he be given probation and be ordered to pay restitution.

The court pointed out that defendant was the one who actually set the fire and had attempted to set the fire on two previous occasions. The offense of arson is a very serious one, and the instant offense endangered lives and livelihoods. Furthermore, imprisonment was necessary so as not to deprecate the seriousness of the offense. Because defendant actually set the blaze, the court sentenced him to four years' imprisonment and restitution.

On July 12, 1991, defendant filed a motion to reduce his sentence. The motion was heard July 24, 1991, and denied.

Defendant argues that his sentence is excessive in light of his potential for rehabilitation and in light of the fact that his codefendant received a lesser sentence although she was just as culpable as defendant. He asks that we reduce his sentence to the minimum term of imprisonment of three years pursuant to the power granted us by Supreme Court Rule 615(b). (134 Ill. 2d R. 615(b).) Finding no abuse of discretion by the sentencing court, we decline to do so.

The imposition of sentence is a matter of judicial discretion, and absent an abuse of that discretion, the sentence may not be altered on review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 883.) This is because the trial judge is normally in a better position to determine the punishment to be imposed than a court of review, and a trial judge's decisions in regard to sentencing are entitled to great deference and weight. *Perruquet*, 68 Ill. 2d at 154, 368 N.E.2d at 884.

■ In the instant case, it does not appear that the trial judge considered improper factors or that he failed to consider any of the mitigating factors and circumstances presented to him. To the contrary, the record reveals that the sentencing court was presented with a great deal of evidence concerning the defendant's history, character and potential for rehabilitation and considered it all. The sentence imposed is only one year above the minimum allowable sentence of three years' imprisonment and is below the maximum allowable sentence of seven years' imprisonment. (See Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1.) It is therefore within the range of allowable sentences. We find no indication that the sentencing court failed to take into account all mitigating factors, including defendant's potential for rehabilitation, in imposing sentence.

A sentencing court need not recite and assign value to each factor in mitigation upon which it is relying, and the existence of mitigating factors does not automatically obligate the court to reduce the sen-

tence from the maximum or to impose the minimum sentence. (*People v. Powell* (1987), 159 Ill. App. 3d 1005, 1011, 512 N.E.2d 1364, 1368.) Furthermore, where, as here, the sentencing court examines the presentence report, it is presumed that the court took into account the defendant's potential for rehabilitation. (*Powell*, 159 Ill. App. 3d at 1011, 512 N.E.2d at 1368.) In the instant case, the court found in aggravation that it was defendant who actually started the fire, and the court considered this strongly in imposing a four-year sentence of imprisonment.

Defendant also argues that his sentence is unfair when compared to that of his codefendant and·therefore should be reduced to that received by his codefendant. We note that although there is a disparity in sentences received by the two codefendants, that disparity is not great, the defendant having received a sentence of four years' imprisonment and King having received a sentence of three years' imprisonment.

Defendant correctly points out that fundamental fairness and respect for the law require that defendants similarly situated not receive grossly disparate sentences. (*People v. Bares* (1981), 97 Ill. App. 3d 728, 738, 423 N.E.2d 538, 545.) When determining whether a sentence is excessive in light of a lesser sentence imposed on a codefendant, consideration is to be given to the differences in criminal background and the degree of participation by each defendant in the commission of the offense. (*People v. Martin* (1980), 81 Ill. App. 3d 238, 245, 401 N.E.2d 13, 18.) A disparate sentence may be supported by either a more serious criminal record or greater participation in the offense. (*Martin*, 81 Ill. App. 3d at 245, 401 N.E.2d at 18.) A greater sentence may be imposed upon a defendant who has been determined to be a leader or instigator in the commission of an offense. *Martin*, 81 Ill. App. 3d at 246, 401 N.E.2d at 19.

In the instant case, the record shows that defendant had a more serious criminal record. King apparently had no prior convictions, while defendant had been convicted of several offenses, although none of them involved violence or bodily harm. Furthermore, the trial court found that defendant was more culpable than King for, although the arson was originally King's idea, it was defendant who pushed the idea, actually attempted two times to start a fire, and finally did start the arson fire. Based on the record before us, we cannot say that the trial court's findings in this regard are against the manifest weight of the evidence. We think these differences are sufficient to support the slightly greater sentence received by defendant.

Furthermore, it is proper for a trial court to grant leniency in sentencing a defendant who by his plea ensured prompt and certain application of correctional measures to him, acknowledged his guilt and showed a willingness to assume responsibility for his conduct, and cooperated in the successful prosecution of other offenders. (*People v. Bergman* (1984), 121 Ill. App. 3d 100, 105-06, 458 N.E.2d 1370, 1375.) We find no indication in the record that the greater sentence imposed upon defendant was imposed as a penalty for defendant's assertion of his right to trial. We think defendant's sentences were based on the sentencing court's due consideration of proper factors, including his potential for rehabilitation, and we find no abuse of discretion in the sentences imposed.

For the foregoing reasons, we affirm the judgment of the circuit court of Shelby County.

Affirmed.

JUSTICE WILLIAM A. LEWIS, specially concurring:

I agree with the reasoning and finding of the majority opinion, but I feel compelled to make some additional comments.

John Clutter testified that the defendant told him how to pass the test and promised him a leather jacket if he beat the test. "Testimony is relevant and admissible that relates to any attempt by a party to conceal or, by threat or otherwise, to suppress evidence or otherwise obstruct an investigation." (*People v. Gacho* (1988), 122 Ill. 2d 221, 247, 522 N.E.2d 1146, 1158.) Surely the evidence that defendant was attempting to bribe a witness and instructed him as to how to stymie the State's investigation indicates a guilty conscience and constitutes an admission. *People v. Gambony* (1948), 402 Ill. 74, 80, 83 N.E.2d 321, 325, *cert. denied* (1949), 337 U.S. 910, 93 L. Ed. 1722, 69 S. Ct. 1045.

If we found that Clutter's testimony warranted a reversal, we would be establishing an exception to the rules of evidence. Evidence that is admissible as an admission, prior inconsistent statement, proof of notice or under any other evidentiary rule becomes inadmissible if the words "polygraph or lie detector" are used or involved in describing the occurrence.

Diana King merely mentioned "the man that gave the lie detector test" as being present during a second interview by the police and further mentioned the lie detector test during cross-examination by the defense in establishing a chronology of the various interviews with the police. If we reverse this case based upon the fact that the

magic words "polygraph or lie detector test" were mentioned, then we would be creating the nightmare that exists in tort cases with the mention of the magic word "insurance."

The polygraph test may be unreliable, but it is an important investigatory tool for the police, especially in the elimination of innocent persons from the investigation or suspicion. We should not create potential reversible error in every case that the polygraph is used, unless its use clearly prejudices the defendant and interferes with the integrity of the judicial process. In this case the evidence was overwhelming against the defendant, so a reversal merely causes a retrial for no other purpose than to see if the prosecutor can coach or "woodshed" his witnesses sufficiently not to violate the rules of the game by mentioning those horrible words "polygraph or lie detector." Meanwhile, defense counsel's only hope is a mistrial and it becomes very tempting for counsel to lure the State's witnesses into the trap. The question of guilt or innocence becomes lost in this game of technicalities.

Finally, I feel that we sometimes fail to give jurors credit for having some intelligence and knowledge. Surely jurors are aware that the polygraph machine exists and that police use it in investigating cases. They may even be aware that such "lie detector tests" are unreliable. Even if the jurors are not aware of the unreliability of polygraph tests, would not a simple instruction from the court to that effect be sufficient to cure any prejudice in those cases where the results are not given to the jury but witnesses mention taking the tests in their testimony?

JUSTICE CHAPMAN, dissenting:

I cannot agree that reference to the polygraph was harmless. The polygraph evidence was admitted through the testimony of John Clutter and Diana King, and portions of that evidence directly concerned the defendant. Although testimony that a coconspirator had taken the polygraph examination does not mean defendant had either taken or failed the test (*People v. Poliquin* (1981), 97 Ill. App. 3d 122, 132, 421 N.E.2d 1362, 1370), given the circumstances of this case the implication that defendant had taken the test was put before the jury. John Clutter's testimony that defendant informed him how to pass the test and that polygraph examinations were easy suggests that defendant had taken the test. There is also the logical implication that because defendant advised Clutter how to take the test, it was defendant who advised him to state during the examination that Clutter knew nothing about the fire.

The problem in this case is that we have no way of knowing the extent to which the jury was affected by the knowledge of the polygraph examinations and the reasonable inferences flowing from the polygraph testimony. (See *People v. Yarbrough* (1982), 93 Ill. 2d 421, 426, 444 N.E.2d 493, 495.) While the effect upon the jury of the polygraph evidence may have been subtle and unconscious, it was at the same time potent. *People v. Taylor* (1984), 101 Ill. 2d 377, 393, 462 N.E.2d 478, 485.

The polygraph evidence in this case went beyond a demonstration of the fact that the witnesses had taken a polygraph and the results of their exams. Subtle suggestions that the defendant had taken a polygraph were admitted. Further, there was an implication of defendant's guilt when Clutter testified that the defendant advised him how to pass the examination. The supreme court has held that the prejudicial effect of polygraph evidence substantially outweighs its probative value because no other form of evidence is as likely to be considered as completely determinative of guilt or innocence as a polygraph examination. (*People v. Baynes* (1981), 88 Ill. 2d 225, 244, 430 N.E.2d 1070, 1079.) The use of the polygraph evidence in this case necessarily interfered with the integrity of the judicial process, and its use requires reversal regardless of the weight of the other evidence. See *People v. Thomas* (1984), 123 Ill. App. 3d 857, 867, 463 N.E.2d 832, 840.