(No.74686

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CHUCK GARD, Appellant.

*Opinion filed February 17, 1994.*

MILLER and HEIPLE, JJ., dissenting.

Daniel M. Kirwan, Deputy Defender, and Michelle A. Zalisko, Assistant Defender, of the Office of the State Appellate Defender, of Mt. Vernon, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Thomas Finks, State's Attorney, of Shelbyville (Norbert J. Goetten, Stephen E. Norris and Kendra S. Mitchell, of the Office of the State's Attorneys Appellate Prosecutor, of Mt. Vernon, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

A jury in the circuit court of Shelby County found the defendant, Chuck Gard, guilty of two counts of arson. He was sentenced to serve two concurrent terms of four years each in the custody of the Illinois Department of Corrections. The appellate court affirmed the judgment of the circuit court (236 Ill. App. 3d 1001),

with one justice dissenting, and we granted the defendant leave to appeal pursuant to Supreme Court Rule 315 (134 Ill. 2d R. 315). The defendant relies upon two points for reversal of the appellate court's decision, namely, that it was reversible error to admit evidence of polygraph examination of a witness and that it was error not to vacate one of the two convictions for arson because the two are based on a single act.

The defendant and the codefendant, Diana King, were charged on September 7, 1990, with two counts of arson, the first count alleging that on or about July 31, 1990, by means of fire they knowingly damaged a building without the owners' consent and the second alleging that on that same date by means of fire and with the intent to defraud an insurer they knowingly damaged that same building. At the three-day trial a number of witnesses testified, among them one of the two owners of the building, which contained several leased offices. Part of the building was leased to Diana King, who operated a music store there known as Music Mountain. The owners insured the building but not its contents. An insurance agent representing Cincinnati Insurance Company testified that the company had issued a fire and liability insurance policy to Diana King protecting the contents of her business against fire up to a limit of $20,000 and that on August 2, 1990, Diana King submitted a claim of loss from the fire in the amount of $17,438. Another witness testified that he could see Music Mountain from his upstairs apartment and that at about midnight on July 28, 1990, while he was watching television, he heard a noise outside, looked out his window, and saw Diana King and her boyfriend, identified as defendant, moving furniture into the back of a truck. At about 3:30 a.m. on July 31, 1990, this witness was awakened and told to leave his residence because of the nearby fire.

Diana King, who was 30 years of age at the time of trial in May of 1991, testified on behalf of the State that she had started the business in December of 1989 with about $7,000 of her daughter's Social Security money and that in June of 1990 business was "real slow." At about that same time she met the defendant, who was unemployed, and shortly thereafter, together with her daughter, moved in with him and his three children. She said that a young man by the name of John Clutter, who worked at her store, had stayed with her and the defendant "for awhile." She described her conversation with the defendant, about a week before the fire occurred, in which they discussed setting fire to the premises of Music Mountain and collecting the insurance, with which they could pay their debts and could buy the children clothes and defendant a "Harley."

King testified further that she and defendant had attempted unsuccessfully, in the presence of John Clutter, to set a fire at her store on the Saturday preceding the fire by placing a faulty extension cord on flammable material. As they did so, she said, John Clutter asked if he could have a certain guitar in the store. Defendant consented to his request, and Clutter took the guitar back to the house she and defendant shared. King stated further that on the following Monday afternoon, after she and defendant had returned to the store, defendant told her that he had put a cigarette in "the chair." Having heard no news of a fire at the store, they returned to it at about 1:30 a.m. Tuesday morning, planning to set the building afire after having first made it look as though a burglary had occurred. They took some items from the store, including the money out of the cash register, which they left open. At King's suggestion that they give the appearance of someone's having entered by way of the entrance from the basement, defendant kicked in the basement door.

However, defendant kicked the wrong side of the door to convey such an impression. Realizing the error, defendant proceeded, nevertheless, to set a chair afire with a lighter. After the fire defendant and King selected a Harley-Davidson motorcycle costing $3,500. King indicated that within approximately a week after the fire, she had given Clutter "details" concerning her participation and that of defendant in setting the building on fire.

King testified that the police questioned her about the fire on a number of occasions. Her initial interview by police occurred on the day of the fire. After she had submitted the insurance claim, she met at the police station with persons associated with law enforcement, specifically, she said on direct examination, "Mr. Marlow and the man that gave the lie detector test." On September 7, 1990, King met with police again and confessed. Following her arrest, she pled guilty to both counts against her. At the time of trial she had not been sentenced, but, she testified, the State had agreed to recommend a prison term of three years in exchange for her pleas of guilty.

On cross-examination King testified that about half an hour prior to the first attempt to set the building afire, she had told John Clutter of the plan and that during that first attempt Clutter had tried to help to put the faulty extension cord in position. She described "interview number three" as "[t]he lie detector test" and testified that at the first three interviews by police, she had denied any knowledge of or involvement in the offense. When King was asked, "Interview number three which is as you are referring to the lie detector test, didn't someone either [Agents] Tankersly or Marlow at that time once again summarize for you what the evidence was that they had against you?" she responded, "Okay, during the lie detector, no, they really, they

thought—no, they didn't say anything about the door then." She indicated also that during the third interview she had stated to Mark Murphy and Agent Don Tankersly that John Clutter "must have done it." Thereafter she testified that before she had confessed, the police had told her that John Clutter had given a statement incriminating her and defendant. King indicated that later in the sequence of approximately five interviews with the police, in order to protect defendant, she had confessed that she alone had committed the offenses; in that confession she had told police that the fire had occurred when she put a cigarette in a chair.

Further on cross-examination King testified that on the night of the fire she and defendant had told Clutter that they were going to return to the store and had asked if he would stay at their house and watch the children. Asked, "And he knew then, he had been informed prior to that what you were going to do?" King responded, "Basically, yes." Clutter had watched the children, she said, to give her and the defendant the opportunity to set the fire at her store. Asked whether she had ever offered Clutter a leather jacket, she answered, "When we were over at [defendant's] brother's house, leather jacket came up or something about a winter jacket and he said he wanted a leather jacket and Chuck and I both said if you pass your test, we will give you a leather jacket." "If we got the insurance money," King said, "the deal was we would give him a leather jacket."

On redirect examination King testified that the conversation concerning a leather jacket had taken place "[w]hen we found out that we had to go take a lie detector test." Asked what was said at that time, King responded, "Just that we were going to take the lie detector test and he mentioned something about a coat. He wanted a coat and we said we would get him a

leather coat if we got the insurance company, if he passed the test and we got the insurance money, we would get him a coat." Asked what part the defendant had played in this conversation, King answered, "He just said that yeah, we will get you one pretty much."

John Clutter, who was 20 years old at the time of trial, testified on behalf of the State that on the Saturday before the fire he was living in a room in the back of the Music Mountain store and that as defendant was about ready to close the store that day, he saw defendant place a faulty extension cord between some papers, saying something like, "[I]t might catch." Clutter denied having done anything with the extension cord, although later, during cross-examination, he admitted to having "touched" it. Clutter said further on direct examination that when "they was moving the stuff out, you know, I knew they was going to torch it and I saw the guitar there and I told her, you know, I might as well take that, can I have it and I said I wouldn't want it to go to waste, it is a good guitar so she let me go ahead and have it." Clutter stated that he helped "put some things in the truck" when defendant and King were moving "just the good stuff" from Music Mountain on Saturday. That night Clutter stayed at the defendant's residence, as he did on Monday evening. Clutter testified that on Tuesday afternoon defendant "said that the cord didn't work and that it took like a lighter or something like that and put it up to the chair and he like turned around for a second and that when he turned back around and I quote the son of a bitch was up to the ceiling by the time I turned around."

Clutter testified that when police first questioned him, he told them he knew nothing about the fire. Clutter said further on direct examination that he had been asked to take a lie detector test and that as "[m]e and Chuck was in the car and Diana was in the car

heading towards Shelbyville to take the test," King told him "that if I did good on it and passed it, you know, that they would get the money and stuff, that they would promise me a leather jacket, you know." Clutter stated that defendant said at that time "that you don't have to really worry about it because they are easy to beat and you know, like wiggle your toes or something like that and then if you tell a lie, just stop moving them and it will throw it off or something." Clutter stated that later he gave a statement concerning the matter to law enforcement authorities and that he told them what he knew about the origin of the fire.

On cross-examination Clutter testified that he "might have" made his first statement to police on August 2, 1990, and that he "could" have made another statement on August 30, 1990. Clutter responded in the affirmative to the question, "And would that have been a statement that you gave to a person by the name of Mark Murphy, polygraph exam?" Clutter described this statement as his second and testified that in it he had denied any knowledge concerning the fire. Clutter was asked whether he had, in fact, been given a polygraph examination and whether during the test he had been asked questions about his involvement; he answered both questions in the affirmative. Asked further, "And that's when you denied having anything to do with it or anything to know about it [sic]?" Clutter responded, "After I took the polygraph test, you know, he told me that I failed." Clutter stated that his answers to questions asked as part of the polygraph examination were, in general, that he "didn't know anything about it and *** didn't have anything to do with it."

Clutter testified that immediately following the polygraph examination, he was interviewed again by Mark Murphy and Agent Tankersly, at which time Clutter indicated that he had been "involved" or "knew some-

thing." Following that interview, Clutter testified, Agent Tankersly interviewed him once again and took a tape-recorded statement from him in the third interview of the day. During that third interview, Clutter said, he told Agent Tankersly everything he knew about the fire and was "truthful" with him. Clutter testified further that after the polygraph examination, he had given a statement to Agent Jeff Marlow as well, in which he was, likewise, "truthful" about his involvement in and knowledge of the fire. Clutter stated further that he had known during his initial interview with Agent Tankersly and during the polygraph examination on August 30, 1990, that he was telling "a lie." Asked whether his statement immediately following the polygraph examination and prior to the tape-recorded statement was "truthful," Clutter said, "After it [the polygraph examination], I told the truth then."

The State called as its next witness Donald Tankersly, an arson investigator employed by the office of the State Fire Marshall. He testified that in his opinion the fire at Music Mountain had begun in the back of an overstuffed chair. Agent Tankersly said that defendant had stated at an interview conducted by Agent Marlow on September 7, 1990, that he and King had entered Music Mountain with the intent of starting a fire in order to collect insurance proceeds, that he had kicked in an interior stairway door to make it appear that a burglary had occurred, and that he had set fire to the overstuffed chair in the back room. On re-cross-examination the witness stated that he had come to defendant as a result of having learned "something" from John Clutter and that he had not interviewed defendant at all prior to that time.

As its final witness the State called Jeffrey Marlow, a special agent in the Department of Criminal Investigation of the Illinois State Police. He testified that, *inter*

*alia*, he had explained to defendant "about my interview that I had done with Mr. Clutter the preceding day." Agent Marlow testified, as had Agent Tankersly, concerning the defendant's incriminating statements made during the interview of him on September 7, 1990.

The defense called Clutter as a witness, referring to, among other matters, the polygraph examination administered to him. Clutter recalled that the persons who were present during the examination were Mark Murphy and Agents Tankersly and Marlow.

The defendant did not testify.

During closing argument the prosecutor pointed out to the jury that

"Chuck Gard only gave one interview. He was not even interviewed until September 7, but by then, we had had the polygraph examination. By then, we had had John Clutter. Perhaps an important part of this when John decided the heat was a little too hot for him, he disclosed what he knew about it. We have got Clutter coming in and saying in effect, I am not taking a fall for anybody else. Yeah, I lied. I told them I didn't know anything about it. Don't know anything about it, and when they said John, we want the truth, he gave them the statement."

Later during closing argument the prosecutor noted, "You have heard from the people who were actually involved in the offense or as close as you can get without having charges filed against you." As virtually his final remark to the jury, the prosecutor chose the following:

"You know, John Clutter was criticized, too. Did he hinder the investigation. Did he lie initially. He sure did. And he righted that right after he got caught in that lie. You know, who knows if he wiggled his toes the right way, he might be wearing a leather coat today and probably wouldn't even feel guilty about it, but it didn't work out that way, folks."

The appellate court concluded that the admission of the evidence concerning polygraph examination constituted error. Noting that the defendant had failed to

object to the admission of this evidence at trial or to raise it in a post-trial motion and that the defendant had elicited the most damaging evidence of this kind at trial, the appellate court elected, under the doctrine of plain error, to review the erroneous admission of the polygraph evidence in this case to determine whether it so prejudiced defendant as to require reversal of his convictions and remand of the cause for a new trial. Describing the evidence of defendant's guilt as "substantial, even overwhelming, even without considering the testimony of Clutter," the appellate court concluded that the error was not reversible because the defendant was not prejudiced by the admission of the polygraph evidence with respect to either Clutter or King to the extent that he was deprived of a fair trial.

This court has consistently held evidence pertaining to polygraph examination of a defendant generally inadmissible, declaring unequivocally in *People v. Baynes* (1981), 88 Ill. 2d 225, 244, that such evidence is inadmissible in Illinois because it is insufficiently reliable. Moreover, the court observed, "[n]o other form of evidence is as likely to be considered as completely determinative of guilt or innocence as a polygraph examination." (*Baynes*, 88 Ill. 2d at 244.) Because the results of polygraph examinations appear to be quasi-scientific, jurors are likely to give such results undue weight. (*People v. Taylor* (1984), 101 Ill. 2d 377, 391-92.) As a consequence, the prejudicial effects of polygraph evidence substantially outweigh its probative value. *Baynes*, 88 Ill. 2d at 244.

Shortly after its decision in *Baynes*, this court found the guidance provided there controlling in *People v. Yarbrough* (1982), 93 Ill. 2d 421, 426. In *Baynes* the court had held polygraph evidence inadmissible in a criminal trial despite the defendant's stipulation prior to the polygraph examination that the results of the test would

be admissible: stipulation cannot and does not render unreliable evidence reliable. In *Yarbrough* the court determined that the defendant should receive a new trial because the trial judge suggested, immediately after the jury's verdict had been received, that the State give the defendant a polygraph examination and withheld his decision upon the defendant's post-trial motion, which questioned the sufficiency of the evidence, until he had inquired into the results of the examination. Thereafter, in *People v. Taylor*, 101 Ill. 2d at 392-93, this court found that its holdings in *Baynes* and *Yarbrough* made it "unthinkable" to allow jurors to be influenced by information concerning a lie detector test obtained from the news media and, thus, out of court:

> "If the biasing effect of the information is so powerful that it cannot be considered, even under the controlled conditions of the courtroom, then certainly access to the same biasing information, under the uncontrolled influence of the news media, cannot be allowed to affect the outcome of a trial. The nature of the information is such that the only way to be sure that a juror is not influenced by it is to insure that the juror is never exposed to the information in the first place. Once the juror believes that a law enforcement or prosecutorial decision has been based upon the results of a lie detector test, the damage has been done."

Similarly, in *People v. Szabo* (1983), 94 Ill. 2d 327, 362, the court had earlier excluded polygraph evidence from a sentencing jury's consideration in a capital case for the same reasons that polygraph evidence was held inadmissible at trial in *Baynes*: doubts concerning the reliability of the polygraph and the risk that a jury will find polygraph results conclusive to the extent that the polygraph usurps the function of the jury as trier of fact.

Recently, in *People v. Melock* (1992), 149 Ill. 2d 423, 465, the court held that polygraph evidence should have been admitted at trial for the limited purpose of

determining the credibility and reliability of the defendant's confession because the exclusion of that evidence deprived the defendant of his fundamental right to a fair opportunity to present a defense. In so holding the court recognized that its

"resolution of this issue is not without regard for the potential prejudicial effect of polygraph evidence. Nevertheless, the importance of permitting the jury to weigh the effects of every motivating circumstance surrounding the obtention of defendant's confession outweighs the importance of avoiding the possible prejudice. However, because of the potential prejudicial effect, any attempt, by either defendant or the State, to explain the nonexistence of the results or to refer to specific questions posed during the course of the examination is barred." (*Melock*, 149 Ill. 2d at 465-66.)

In conclusion the court in *Melock* expressed the caution that

"[w]e do not here, today, announce a general rule on the admissibility of polygraph evidence. We, instead, reserve the opportunity to revisit our position on the general inadmissibility of such evidence as particular issues are presented in future cases. We remain firm in our position that the fact, details or results of a polygraph examination are generally inadmissible on the issue of guilt or innocence." (*Melock,* 149 Ill. 2d at 466.)

The case before us presents such an opportunity.

As the quotations from the record reveal, polygraph evidence was very much a part of this defendant's trial. It would serve no useful purpose to catalogue all of the references to polygraph testing that abound in this record. Suffice it to say that at defendant's trial such references were casual and commonplace, virtually ubiquitous. Testimony concerning the polygraph examinations of both Diana King and John Clutter permeates the transcript of proceedings at trial. Indeed, during the course of defendant's trial the polygraph examination of John Clutter became the lodestar by which the jury was invited to measure truth: that which Clutter spoke until

and during his polygraph examination was false; that which he spoke once advised by police that he had failed the polygraph examination was true. Clutter's testimony at trial was consistent with the latter; *ergo*, by implication, Clutter's testimony at trial was true. By further implication, other witnesses' testimony consistent with that of Clutter was necessarily true.

For the same reasons that this court has held evidence of polygraph examination of a defendant inadmissible at trial, we hold evidence of polygraph examination of a witness inadmissible at trial. Evidence of polygraph testing is rendered no more reliable, and jurors deem it no less worthy of belief, because the person tested was a witness rather than a defendant. Whether the examination is of defendant or witness, evidence of polygraph testing is equally unreliable and likely to be accorded undue weight with the result that its prejudicial effect far exceeds its probative value. As this record amply demonstrates, the use of polygraph evidence at a defendant's trial is no less repugnant and no less an affront to the integrity of the judicial process when the examination has been given to a witness at the defendant's trial than it is when the examination has been given to the defendant himself.

It is a familiar rule that an objection to the introduction of evidence not made at the time of admission and an error not raised in a post-trial motion will be deemed waived for review. (*Baynes*, 88 Ill. 2d at 230.) However, this court may notice error rising to the level of plain error in spite of the defendant's failure to record objections and to preserve properly the record for review. (*Baynes*, 88 Ill. 2d at 230.) If the admission of evidence constitutes plain error that causes a miscarriage of justice upon a defendant or a tainting of the integrity and reputation of the judicial process, the error is considered although it was not brought to the attention

of the trial court. (*Baynes*, 88 Ill. 2d at 231.) While one purpose of the plain error rule is to afford certain protections to the accused, the other is to protect and to preserve the integrity and the reputation of the judicial process. (*Baynes*, 88 Ill. 2d at 230-31.) As it was in *Baynes*, the latter purpose is the focus of our concern here. Like the evidence in *Baynes*, the evidence here is not so closely balanced that the defendant may be said to have been prejudiced by the introduction of the polygraph evidence and thereby prevented from receiving a fair trial. Like the defendant in *Baynes*, this defendant himself caused, in part, the admission of polygraph evidence. Nevertheless, in *Baynes* this court determined that the stipulated admission of polygraph evidence rose to the level of plain error because it was error impinging upon the integrity of our judicial system. So, too, do we today rule that the admission of evidence of polygraph testing of witnesses at defendant's trial constituted plain error because it was error compromising the integrity and tarnishing the reputation of the judicial process itself.

Accordingly, we reverse the judgments of the appellate and circuit courts and remand the cause for a new trial. In light of our disposition concerning this issue, we need not consider the other point upon which defendant relies for reversal.

*Judgments reversed;*
*cause remanded.*

JUSTICE MILLER, dissenting:

I do not agree with the majority's conclusion that the defendant is entitled to a new trial. Although the introduction of testimony concerning polygraph testing is generally considered error, I do not believe that the erroneous presentation of such evidence in the case at bar warrants reversal of the defendant's convictions.

At trial, the defendant did not object to the State's

introduction of polygraph evidence or raise the issue in his post-trial motion. Indeed, the defendant introduced similar testimony in his own behalf through cross-examination of the prosecution witnesses and as part of the defense case in chief. Not until the case was before the appellate court did the defendant challenge the introduction of the polygraph testimony. Because the issue has not been properly preserved for appeal, reversal is warranted here only if the admission of this evidence constituted plain error. See 134 Ill. 2d R. 615(a).

Recently, in *People v. Melock* (1992), 149 Ill. 2d 423, this court determined that a defendant could not be precluded from presenting, at trial, evidence regarding polygraph testing if the testimony was relevant to the defendant's contention that his confession was not credible or reliable. *Melock* recognized our longstanding disapproval of the introduction of polygraph evidence, yet the court believed that the exclusion of evidence of the circumstances of the defendant's confession, including testimony concerning his taking of a polygraph exam, had denied the defendant his right to present a defense.

As *Melock* demonstrates, not every mention of polygraph testing necessarily results in a new trial, for there are some circumstances in which a defendant is entitled to present such testimony. If the evidence must be admissible in certain cases, as *Melock* held, the justification for a rule of automatic reversal in all other instances becomes less persuasive. To this extent, then, I believe that *Melock* has undermined the rationale for the automatic reversal rule expressed in *People v. Baynes* (1981), 88 Ill. 2d 225, on which the majority primarily relies.

The evidence of the defendant's guilt in the case at bar was overwhelming. The defendant provided authorities with a detailed confession of his role in the charged

offenses. His codefendant, Diana King, testified against him at trial, implicating him fully in the arson. In addition, much of the testimony now complained of was elicited by defense counsel, whose own examination of the witnesses was apparently intended to exploit certain inconsistencies in the details of the investigation. For these reasons, I do not believe that the presentation of the polygraph evidence in the present case rises to the level of the plain error. The majority's conclusion to the contrary perpetuates an unnecessary and unwise rule of law, and I respectfully dissent.

JUSTICE HEIPLE, also dissenting:

A cat once made the mistake of sitting on a hot stove. It never sat on a hot stove again. It never sat on a cold stove again either. After its initial unpleasant experience, the cat jumped to a couple of erroneous conclusions. First, that it was the stove and not the heat which singed its derriere. Second, that there is no difference between a hot stove and a cold one. So it is with the majority opinion in the instant case.

The majority reverses the conviction in this case merely because testimony was introduced concerning the use of a lie detector or polygraph. This, notwithstanding the majority's concession that the defendant was not prejudiced by the introduction of the polygraph evidence, that the defendant himself caused, in part, the admission of polygraph evidence, and that the defendant received a fair trial.

Purporting to ground its decision on precedent, the majority cites to *People v. Baynes* (1981), 88 Ill. 2d 225. In *Baynes*, the prosecutor and defendant had entered into a stipulation that the defendant would take a lie detector test. Further, that if the defendant passed the test, the charges would be dropped. However, if the defendant failed the test, the test results could be introduced in evidence against him. Subsequently, the defen-

dant took and failed the test. He went to trial and, pursuant to stipulation, the results of the test were introduced in evidence without objection. The defendant was convicted. In reversing the conviction, that opinion (itself unfortunate) pontificated that polygraph evidence is unreliable, and that its introduction in evidence is plain error which impinges upon the integrity of the judicial system. (*Baynes*, 88 Ill. 2d at 244.) In the instant case, the majority opinion draws on that language to support its decision to reverse.

Even if we were to assume that *Baynes* was correctly decided (a large concession), it does not follow that *Baynes* controls the case at hand. In *Baynes*, the polygraph results were introduced to prove that the defendant was lying. Nothing of the sort happened in the case at hand. What came out in the instant trial was simply that two of the witnesses took lie detector tests as part of the investigation process.

I most strenuously disagree with the majority's finding that reversal of this conviction is necessary merely because reference to a polygraph was before the jury. Here, the evidence of guilt is overwhelming, the defendant suffered no prejudice from the admission of this evidence, and the trial was admittedly fair. The majority believes that reversal is necessary to preserve the integrity of our judicial system, and that to do otherwise would tarnish the reputation of the judicial process itself. To the contrary, I believe that the opposite is true. Affirmance is necessary to preserve not merely the integrity of the judicial system but its credibility as well.

Justice William A. Lewis participated in the appellate court opinion which affirmed the trial court. (236 Ill. App. 3d 1001.) In supporting the affirmance, he opined:

"If we reverse this case based upon the fact that the magic words 'polygraph or lie detector test' were men-

tioned, then we would be creating the nightmare that exists in tort cases with the mention of the magic word 'insurance.'

The polygraph test may be unreliable, but it is an important investigatory tool for the police, especially in the elimination of innocent persons from the investigation or suspicion. We should not create potential reversible error in every case that the polygraph is used, unless its use clearly prejudices the defendant and interferes with the integrity of the judicial process. In this case the evidence was overwhelming against the defendant, so a reversal merely causes a retrial for no other purpose than to see if the prosecutor can coach or 'woodshed' his witnesses sufficiently not to violate the rules of the game by mentioning those horrible words 'polygraph or lie detector.' Meanwhile, defense counsel's only hope is a mistrial and it becomes very tempting for counsel to lure the State's witnesses into the trap. The question of guilt or innocence becomes lost in this game of technicalities. Finally, I feel that we sometimes fail to give jurors credit for having some intelligence and knowledge." 236 Ill. App. 3d at 1018-19 (Lewis, J., specially concurring).

Well, the nightmare which Justice Lewis envisioned has arrived. The majority opinion has created a *per se* rule which, though simple to apply, is inherently both thoughtless and unreasonable.

Accordingly, I respectfully dissent from the decision of the court.