THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
THOMAS H. BARES *et al.*, Defendants-Appellants.

Second District   Nos. 80-33, 80-34 cons.

Opinion filed June 30, 1981.

Mary Robinson and John J. Barrett, both of State Appellate Defender's Office, of Elgin, for appellants.

Phyllis J. Perko and Marshall Stevens, both of State's Attorneys Appellate Service Commission, of Elgin, for the People.

Mr. JUSTICE REINHARD delivered the opinion of the court:

The defendants, Thomas H. Bares and James R. Edwards, were jointly tried and found guilty of the offenses of armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2) and robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—1) in a jury trial in the circuit court of Kane County. Upon denial of their post-trial motions, and after vacating the judgments of conviction for the lesser-included offense of robbery, the trial court conducted a sentencing hearing and sentenced Bares to six years' imprisonment and Edwards to 26 years' imprisonment. Defendant Bares appeals from the denial of his pretrial motion to quash his arrest, alleging it was effectuated inside his apartment without an arrest warrant and absent exigent circumstances. Defendant Edwards appeals only his sentence, contending it was excessive compared with that of his co-defendant, and asks us to reduce that sentence.

At the evidentiary hearing conducted on the motion to quash the arrest, the following pertinent testimony was introduced. Detective Joseph Donahoe of the Carpentersville Police Department stated that on July 15, 1979, there was an armed robbery of a Carpentersville 7-Eleven store. After talking to an informant, Donahoe contacted Detectives Ryan and Baker of the Chicago Police Department since he had reason to believe that one of the offenders lived in the area of Seeley Avenue in Chicago. Donahoe also had learned from the witnesses that two white

males in their twenties were involved in the holdup and that the vehicle they were driving was a yellow Chevrolet Monte Carlo with license plates which began with the letters "U.S." Donahoe drove to Chicago the next evening and discussed the case with the Chicago detectives, who gave him seven photographs of possible suspects. Donahoe returned to Carpentersville with the photos and showed them to the store clerks who were working at the time of the robbery. The two clerks who were operating the cash register at the time both identified defendant Bares as one of the participants. After this photo identification of Bares, Donahoe contacted a Kane County assistant state's attorney who "authorized a warrant for the arrest of Thomas Bares for armed robbery." The Chicago police were then notified that Bares had been identified as one of the assailants. Bares was arrested that evening by Chicago police officers; the arrest warrant was not issued until the following morning.

Detectives Ryan and Baker testified regarding being contacted by Donahoe in reference to the armed robbery. They indicated that Donahoe gave them a description of the suspects, the weapons used and the automobile involved (a yellow Monte Carlo with license plates beginning with "US 42_ _"). After checking the US 4200 series, the officers found no plates registered to a yellow Monte Carlo. Baker and Ryan then met with Donahoe and another Carpentersville officer and went to the area of Wilson and Damen avenues in Chicago since they had information that a third suspect, a juvenile, was involved and lived in that neighborhood. That trip proved to be fruitless, but the two Chicago officers later returned by themselves to that vicinity and spotted a yellow Monte Carlo double parked at approximately 4524 North Seeley. Baker and Ryan ran a check on the license plates, YJ 2199, which came back registered to Thomas Bares with an Elk Grove Village address.

A photo of Mr. Bares was obtained from police records and given to Carpentersville police. After a positive identification had been made, Donahoe called the Chicago officers and informed them of the identification and of the fact that he was in the process of obtaining a warrant. A short time after this conversation, at approximately 10:45 p.m., Ryan and Baker, along with two other Chicago detectives, drove to the area of Damen and Wilson in an attempt to locate the vehicle again. The officers spotted the vehicle with four occupants proceeding northbound on Seeley Avenue.

After spotting the vehicle, the Chicago detectives pursued it for approximately a quarter of a block with the headlights of their unmarked car flashing. When the Monte Carlo stopped, Detectives Baker and Ryan said they exited their vehicle, Ryan with a shotgun and Baker with a sidearm. Baker then said: "Police. Get out of the car." According to Ryan and Baker, the Monte Carlo then sped off at a high rate of speed. Ryan

then fired one round from the shotgun at the lower right rear side of the vehicle "in an attempt to disable the vehicle." The vehicle immediately stopped and defendant Edwards exited from the driver's seat and was taken into custody, along with the other three occupants of the vehicle. A loaded .32-caliber revolver was found underneath the front seat by the driver's side. In response to questioning by Ryan, Edwards told the officers that the vehicle belonged to Thomas Bares and indicated that Bares was in an apartment building off to the side of the street.

Detective Ryan, along with another detective and a uniformed officer, went to the front of the building at 4525 North Seeley Avenue, while Detective Baker went to the rear of the building with another detective and a uniformed officer. As Ryan approached the building, he met the landlady of the building who told him that Bares lived on the first floor. While she went off to find a key to Bares' apartment, the police knocked on his door. After approximately five minutes of knocking, the landlady had not returned with a key so, according to Ryan, the officers entered Bares' apartment through an unlocked window. After Bares was secured, the other officers were let in through the front door. As the officers entered through the window, one of the uniformed men yelled, "Police." Defendant Bares was found lying on a mattress in one of the bedrooms and was subsequently arrested at gun point, taken into custody, and a gun and money seized.

Rose Marie Hoffman, defendant's landlady, testified at the hearing that on July 16, 1979, she was watching television in her home when she heard a gunshot. She went outside and saw that two detectives' cars had pinned in Bares' Monte Carlo, which had seven gunshot holes in it. After back-up police arrived, Detective Ryan said, "Let's get Bares." She testified that the following conversation then took place:

"RYAN: Is Mr. Bares inside?
HOFFMAN: I don't know; I don't think so.
RYAN: Do you have a key?
HOFFMAN: I don't know.
RYAN: Well, I want Bares. Get me a key.
HOFFMAN: I'll look."

When she returned to tell the officers that she couldn't find a key, she observed that they had removed a screen to Bares' apartment window. After the police left, she went in and "closed up" Bares' apartment.

Diane Abdelkoui testified that on July 16, 1979, at approximately 10:15 p.m. she was riding in a Monte Carlo with James Edwards, Michael Abdelkoui and Betty Dunn. As Edwards was preparing to park the vehicle, Michael Abdelkoui looked back to see if the car would fit into the parking space, and yelled, "Everybody duck, someone's going to shoot at us." Then, a shot was fired at their vehicle and they were ordered to come

out. Abdelkoui said that, prior to the gunshot, they were given no warning to stop. After the shot, she said Edwards "floored the car" but stopped after travelling approximately 10 yards.

Betty Dunn's testimony corroborated that of Abdelkoui regarding the events leading up to, and just after, the car was struck with gunfire. She said that at the time the shot was fired, Edwards was actually backing the car up and that after the shot was fired the car went forward for several inches before stopping. Both Dunn and Abdelkoui said that the officers did not identify themselves as police when they stopped the car.

After argument by the State and defense counsel, the court denied the motion to quash the arrest. Defendants also filed a motion to suppress oral and written statements made while in custody. Following a hearing thereon, the trial court denied that motion. However, the propriety of that ruling is not at issue here.

At trial, the following additional relevant testimony was adduced. Julie Aguirre testified that on July 15, 1979, she was employed as a cashier at the Carpentersville 7-Eleven and was working with Sue Mueller, another cashier. At about 3 p.m., a man, whom she later identified as defendant Edwards, approached the cashiers holding a gun and said, "This is a holdup. Give me the money." Aguirre opened the cash drawer and put a stack of twenties on the counter, but Edwards demanded, "There has to be more money." She then put the $10 bills on the counter also.

Aguirre then attempted to hit the burglar alarm and Edwards screamed, "You hit the burglar alarm." She shouted "no" and ducked under the counter while Sue Mueller ran to the back of the store. Aguirre then heard someone come behind the counter, pick up and drop the cash register drawer. That individual, whom she identified in court as defendant Bares, also carried a gun.

At that point, Aguirre stood up and saw Edwards bringing the store manager, Nancy Kuppin, up to the front of the store. Kuppin was walking in front of Edwards and he held her by one arm while pointing a gun at her. He then ordered her to open the store safe. After that was accomplished, the defendants ran out of the store. While Aguirre did not observe the defendants removing money from the safe, she did look in the safe after they left and saw that it was empty. Just after the robbery, she looked outside and saw a gold Monte Carlo pull away.

The following evening, Detective Donahoe came to the store with several photographs of possible suspects, and Aguirre identified the photograph of defendant Bares and told Donahoe that Bares was one of the participants in the armed robbery. On July 17, 1979, Donahoe returned with more photographs and Aguirre picked out two as being of the

assailants. In court, Aguirre identified both of the defendants, as well as the weapons used.

Sue Mueller testified that on July 15, 1979, at approximately 3 p.m., she was working behind the cash register at the Carpentersville 7-Eleven when a man, whom she identified at trial as being defendant Edwards, entered with a gun in his hand and held up the store. After Julie Aguirre opened the cash register and placed some money on the counter, Mueller screamed and ran to the back of the store and told the store manager that a robbery was taking place. Mueller then walked towards the front of the store and saw defendant Bares for the first time. He was carrying a gun and approached Mueller and another girl and told them not to be afraid and not to scream. He then placed them in one of the store coolers.

The following day, Detective Donahoe showed Mueller a group of photographs and she picked out the picture of Bares and identified him as one of the participants in the armed robbery. Donahoe returned on July 17, 1979, with more photographs, but Mueller said she was unable to make a positive identification of the second assailant without seeing him in person. A lineup subsequently was conducted and, at that time, she was able to identify Edwards as one of the participants. At trial, she identified both defendants and the weapons used in commission of the offense.

Howard Hall, who was employed as a 7-Eleven stockboy at the time of the robbery, testified at trial in a similar manner regarding the occurrences in the Carpentersville store. Following the robbery, Hall also picked Bares' picture from a series of photographs shown to him by Detective Donahoe. Subsequently, he viewed a five-man lineup and identified Edwards as being one of the armed robbers. At trial, he identified the defendants and the weapons used.

Detective Donahoe testified regarding the investigation of the robbery, and the subsequent apprehension and arrest of the defendants. He indicated that, during interrogation at police headquarters, both defendants orally confessed to commission of the armed robbery, giving detailed accounts of what transpired.

The only defense witnesses were Rose Marie Hoffman whose testimony at the motion to quash the arrest was by stipulation read to the jury, and Diane Abdelkoui who testified to the manner in which Edwards was stopped and arrested.

The first issue we address on appeal is whether the trial court erred in refusing to quash Bares' arrest, which was effected in his apartment without a warrant. Citing *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, and *People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543, defendant Bares argues that his warrantless arrest should have been quashed since it was effected inside his residence and without

the existence of exigent circumstances. In *Payton*, the United States Supreme Court held that the fourth amendment applies equally to seizures of persons and to seizures of property, and prohibits the police from making a warrantless, nonconsensual entry into a suspect's home in order to effectuate a felony arrest, absent exigent circumstances:

> "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." (445 U.S. 573, 590, 63 L. Ed. 2d 639, 653, 100 S. Ct. 1371, 1382.)

The *Payton* court, however, did not elaborate on what it considered to be "exigent circumstances" sufficient to justify a warrantless, residential arrest.

In *Abney*, our supreme court examined the arrest statute (Ill. Rev. Stat. 1979, ch. 38, par. 107—1 *et seq.*) and concluded that it was in compliance with *Payton* since the principles of the exigent circumstances rule had been judicially engrafted on the statute in past decisions. More specifically, the court addressed the legal question of whether, under the facts presented, exigent circumstances-existed to justify the warrantless arrest of the defendant inside his home. In its analysis, the court considered the following factors as relevant on the question of exigency:

> (1) "[T]he officers' decision to proceed to defendant's residence without a warrant immediately followed receipt of the victim's statement only 1½ hours after the beating. The receipt of such information about a relatively recent offense could suggest to the officers a need for prompt action." (81 Ill. 2d 159, 169, 407 N.E.2d 543, 547.)
>
> (2) "[T]here was no deliberate or unjustified delay by the officers during which time a warrant could have been obtained." (81 Ill. 2d 159, 170, 407 N.E.2d 543, 548.)
>
> (3) "[T]he need for prompt action was further made apparent by the belief that the suspect was armed and exhibited some sign of a violent character." (81 Ill. 2d 159, 171, 407 N.E.2d 543, 548.)

In addition to those factors, indicative of exigency, the court pointed to the following factors which suggested to the court that the officers acted in a reasonable manner:

> (1) "[T]he officers were acting on 'a clear showing of probable cause' [citation] based on the type of 'reasonably trustworthy information' [citations] necessary to justify warrantless law enforcement activities." (81 Ill. 2d 159, 171-72, 407 N.E.2d 543, 549.)
>
> (2) "[D]efendant was clearly identified as the assailant." (81 Ill. 2d 159, 172, 407 N.E.2d 543, 549.)
>
> (3) "[T]he victim's statement created strong reason to believe that

defendant was in the premises entered." (81 Ill. 2d 159, 172, 407 N.E.2d 543, 549.)

(4) "[T]he entry here was peaceful." (81 Ill. 2d 159, 172, 407 N.E.2d 543, 549.)

Cautioning that each case must be decided on the basis of the facts presented, the *Abney* court upheld the warrantless arrest involved therein.

The parties here agree that the arrest of defendant Bares was made in his apartment without a warrant. They differ, however, on the issue of whether exigent circumstances existed at the time of the warrantless entry into Bares' apartment. Defendant argues that, unlike *Abney* where the arrest took place only an hour and a half after commission of the offense, this arrest was made approximately 33 hours after the armed robbery took place and, therefore, could not be considered within the spirit of the hot pursuit doctrine. (See *People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543.) Although conceding that probable cause existed, defendant contends that the police should have waited until the following morning to arrest defendant since an arrest warrant was actually issued at that time. Finally, defendant points to the "forcible" method used by the police in entering defendant's apartment; they climbed through an open window at night with guns drawn.

■■ As the court pointed out in *Abney*, each case involving a warrantless residential arrest must be decided on the individual facts presented. (81 Ill. 2d 159, 173, 407 N.E.2d 543, 549.) After reviewing the testimony presented at the hearing on the motion to quash, in light of the *Abney* exigency and reasonableness factors, we are convinced that the trial court acted properly in denying defendant Bares' motion. First, we consider it important that the police were taking proper steps to obtain a warrant to effectuate the arrest of Bares. However, intervening circumstances (*i.e.*, the observance of Bares' car moving on a public street) justified prompt action by the police to stop the car which had previously been identified as leaving the scene of the armed robbery, and to attempt to apprehend the owner, Bares, who had been identified as one of the robbers, and listed as owner of the vehicle. Only after ascertaining that the driver of this vehicle was not Bares did the police then make the decision to arrest Bares without a warrant. We believe that these additional circumstances which became available to the police after the apprehension of Edwards necessitated prompt police action. The police now were aware that Bares lived within a few houses of where the vehicle was stopped and the shooting at the vehicle may have alerted Bares of police presence, thereby causing him to flee or prevent his peaceful arrest by warrant. Also, the police had found a gun on Edwards, who was driving Bares' vehicle, thereby indicating further the dangerousness of the situation.

■■ Therefore, while the arrest of Bares was some 33 hours after the crime, it was within minutes of these new circumstances upon which the police reacted quickly. (See *People v. Thompson* (1981), 93 Ill. App. 3d 995, 1005, 418 N.E.2d 112, 120.) We therefore believe that such circumstances suggested to the officers the need for prompt action to quickly apprehend a possible armed suspect and prevent his escape. The exigency of the circumstances need not only arise immediately after commission of the crime, but also may occur when subsequent events provide additional facts which justify immediate action. See, *e.g., People v. Robinson* (1980), 91 Ill. App. 3d 1138, 415 N.E.2d 585; *People v. Haynes* (1980), 89 Ill. App. 3d 231, 411 N.E.2d 876; *In re Willis* (1980), 89 Ill. App. 3d 347, 411 N.E.2d 1126.

■■ Second, there certainly was no deliberate or unjustified delay by the officers during which time a warrant could have been obtained. In fact, at the time of Bares' arrest, the procedure for obtaining a warrant had already commenced, and only intervening circumstances necessitated immediate action prior to obtaining that warrant. The police justifiably could have feared flight by Bares, considering that the commotion attendant upon Edwards' arrest occurred within close proximity to Bares' apartment.

■■ Third, the need for prompt action was further made apparent by the belief that Bares may be armed and could be violent. This was an armed robbery they were investigating, they had to forcibly stop someone driving the defendant's car, and they found a weapon under the front seat of that car once it was stopped. Under these circumstances, the police should not be required to wait for a person who might be armed to escape, but were further justified in proceeding on information at hand that a possibly armed and dangerous felon was nearby. *People v. Abney* (1980), 81 Ill. 2d 159, 171, 407 N.E.2d 543; *People v. Barbee* (1966), 35 Ill. 2d 407, 411, 220 N.E.2d 401.

■■ Furthermore, other factors were present which indicate that the officers acted reasonably. The officers were acting on a clear showing of probable cause when they arrested Bares based upon the photo identification of Bares and the description of the vehicle used in the commission of the crime. (See *People v. Bean* (1981), 84 Ill. 2d 64, 68-69, 417 N.E.2d 608, 610.) Defendant Bares had been identified positively by two of the victims as one of the participants in the armed robbery which certainly supplied probable cause. (See *People v. Montgomery* (1981), 93 Ill. App. 3d 498, 504, 417 N.E.2d 686, 690.) The officers also had good reason to believe that Bares was in the premises entered despite the equivocal responses of his landlady. His car was being driven by Edwards, and a reasonable conclusion is that he was therefore at home. Also, Officer Ryan testified that he asked Edwards where Bares was and Edwards

indicated an apartment building on that street. Finally, although the police entered through a window, such an entry cannot be appropriately termed "forcible" in the context in which it occurred. The window was unlocked, and the officers entered only after defendant failed to respond to knocks on his door. (Compare, *e.g.*, *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, where the police gained entry to the defendant's residence by prying open his door with a crowbar.) The nature of the entry under these circumstances was reasonable, and no violence resulted from this entry. (See *People v. Montgomery* (1981), 93 Ill. App. 3d 498, 504, 417 N.E.2d 686, 690.) The fact that the officers had drawn guns does not, in our view, override all the other factors indicating the reasonableness of the officers' actions in effectuating Bares' arrest without a warrant.

Therefore, we conclude that the warrantless arrest of defendant Bares was proper, even though it took place in his home, since the police were acting upon probable cause and under exigent circumstances. Accordingly, the trial court order denying Bares' motion to quash the arrest will be affirmed.

The remaining issue relates to the sentence received by defendant Edwards; that is, whether the trial court abused its discretion in sentencing Edwards to 26 years with the Department of Corrections. Edwards argues that such a sentence is excessive when compared to defendant Bares' sentence of six years, and where both defendants were active participants and do not have greatly dissimilar criminal records. Edwards has two prior convictions as an adult: one for possession of marijuana in 1971 and a second for armed robbery in 1973, for which he served 5½ years in the penitentiary. Bares' only conviction was in 1968 for criminal trespass to a motor vehicle (reduced from grand theft) for which he was sentenced to one year of court supervision. Although Edwards admits in his brief that he played a more dominant role than Bares in the commission of the offense and that he has a worse criminal record, he maintains that these facts alone do not justify a sentence more than four times the minimum sentence received by Bares.

Additional differences in these two defendants were conscientiously evaluated by the trial judge at the sentencing hearing. The trial judge stated that he was impressed with Bares' past good conduct and his relatives' willingness to assist him upon his release, and gave consideration to the presentence examiner's opinion that he acknowledged his wrong-doing and was remorseful. With respect to Edwards, the trial judge commented critically upon his prior conviction for armed robbery, his threats to do bodily harm to victims and the presentence report indicating a lack of responsibility and remorse.

The issue of disparate sentencing was addressed recently in *People v.*

*Martin* (1980), 81 Ill. App. 3d 238, 401 N.E.2d 13, wherein the court said:

> "When determining whether a sentence is excessive in light of a lesser sentence imposed on a co-defendant, consideration is to be given to the differences in criminal background and the degree of participation by each defendant in the commission of the offense. [Citations.] A disparate sentence may be supported by either a more serious criminal record [citation] or greater participation in the offense [citation]. Otherwise, defendants similarly situated ought to receive similar treatment in sentencing, as is required by fundamental fairness. [Citation.]" (81 Ill. App. 3d 238, 245, 401 N.E.2d 13, 18.)

Inasmuch as Edwards has conceded that his criminal record is more serious than Bares', and that he participated to a greater degree in the commission of the armed robbery than Bares, the question becomes whether such differences support the vast disparity in the sentences imposed. We believe that they do not.

■■ While Edwards may have played a more dominant role in the armed robbery, as he concedes, it was not really significantly different than the role played by Bares. Both men carried guns, although Bares' weapon was not loaded; Edwards was the one who actually demanded the money from the store clerks, but Bares was in the store rounding up people and putting them in the coolers; and, both defendants shared in the proceeds of the robbery. While these differences in degree of participation may justify some disparity in the sentences imposed, they do not, in our opinion, warrant imposing a sentence on Edwards that is over four times greater than that imposed on co-defendant Bares. Nor do we think that the differing criminal records of the two defendants justify such a grave disparity. While there is no doubt that Edwards' prior armed robbery conviction makes his record worse than Bares' and justifies a more severe sentence, we believe the disparity here to be too great to be consistent with fundamental fairness, even considering the court's comments on the differences in their attitudes.

■■ While we are cognizant of the frequently stated rule that the trial judge's decisions regarding sentencing are entitled to great deference because the trial judge is ordinarily in a better position to determine the punishment to be imposed (see, *e.g., People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882), we nevertheless believe that Edwards' sentence is so extremely disparate that it must be reduced to be more consistent with that of his accomplice. Fundamental fairness and respect for the law require that defendants similarly situated not receive grossly disparate sentences. (*People v. Henne* (1973), 10 Ill. App. 3d 179, 180, 293 N.E.2d 172.) Accordingly, pursuant to Supreme Court Rule 615(b)(4) (Ill. Rev. Stat. 1979, ch. 110A, par. 615(b)(4)), we hereby reduce defendant

Edwards' sentence to a term of 18 years with the Department of Corrections.

Reversed in part; affirmed in part.

UNVERZAGT and VAN DEUSEN, JJ., concur.