THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. YE-SHUA JONES *et al.*, Defendants-Appellants.

First District (2nd Division)   Nos. 1—91—0038, 1—91—0070 cons.

Opinion filed February 2, 1993.

Michael J. Pelletier and Maria A. Harrigan, both of State Appellate Defender's Office, of Chicago, for appellants.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Jane Liechty Loeb, and Elizabeth A. McDevitt, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Defendants Yeshua Jones and Robert Salazar appeal from their conviction after a bench trial on two counts of criminal sexual

assault. (Ill. Rev. Stat. 1989, ch. 38, par. 12—13.) They were each sentenced to five years in the custody of the Illinois Department of Corrections.

In their appeal defendants raise two issues. First, whether the trial court erred in granting the State's motion *in limine* to exclude evidence that Jones had observed the victim engage in consensual sexual activities approximately one month before the sexual assault that forms the subject matter of this case. Second, whether the court abused its discretion by sentencing defendants to five years incarceration, while a co-participant in the assault, Marcus Battice, in a negotiated plea, received only 30 months' probation and 800 hours of community service.

Defendants were charged with four counts of criminal sexual assault for events which transpired on January 25, 1989. Initially, the indictment charged Battice with the same four counts; however, as noted above, prior to trial, and pursuant to an agreement with the State, Battice pled guilty to four counts of misdemeanor sexual abuse (Ill. Rev. Stat. 1989, ch. 38, par. 12—15), and one count of unlawful restraint (Ill. Rev. Stat. 1989, ch. 38, par. 10—3). He was placed on probation for 30 months and compelled to perform 800 hours of community service, while another participant in the sexual assault, Herman Lofton, a minor, was adjudged delinquent in a juvenile proceeding and placed on six months' probation.

The State, invoking the rape shield statute (Ill. Rev. Stat. 1989, ch. 38, par. 115—7), moved *in limine* to exclude any evidence concerning the complainant's sexual reputation or her prior sexual activity with anyone other than defendants. In response, Jones informed the court that he had observed the victim engage in consensual sexual intercourse and oral copulation with Battice sometime between Christmas 1988 and January 24, 1989, the date of the incident at issue here. Both defendants argued that this evidence was relevant and vital to their defense that the victim consented to the sexual encounter with all four of the accused. Jones further contended that the fact that he had watched the victim perform sexual acts was relevant to his state of mind at the time of the assault.

The trial court, reasoning that the legislature enacted the rape shield statute to address the precise situation presented in this case, rejected these arguments and granted the State's motion. It also deemed Jones' state of mind as to the victim's willingness to participate in sexual activity to be irrelevant under the Illinois criminal sexual assault statute. Ill. Rev. Stat. 1989, ch. 38, par. 12—13(b).

At trial, the complainant, A.B., a 15-year-old student at Evanston

Township High School, testified that on January 24, 1989, at approximately 5:20 in the afternoon, she went to her locker after finishing practice with the school's track team. When she arrived at her locker, Salazar and Lofton approached her and Salazar asked for her phone number, but she refused to give it to him.

A.B. testified that after she denied Salazar's request for her phone number, he forced her against the locker and roughly fondled her breasts. He then grasped her wrist and pulled her towards the men's washroom. Once inside the lavatory, he took her into a bathroom stall, asked her "to do him" and attempted to remove her pants. The victim told the court that Salazar stopped only when she informed him that a janitor was in the washroom with them.

Lofton also testified as a prosecution witness, but related a slightly different version of the events at A.B.'s locker. He informed the court that Salazar did not grasp at the victim's breasts, but that his hand only brushed against them while he put his arm around her shoulders. He also stated that the victim willingly went with Salazar to the bathroom.

The complainant testified that after leaving the washroom, she headed for the field house to leave the school; Lofton and Salazar followed her. Lofton recalled that Salazar and A.B. held hands on the way to the field house. The victim passed a security guard who had to let her through a gate to gain access to the women's locker room. When asked why she did not tell the security guard about the alleged assault by Salazar in the washroom, she stated that she did not want to cause trouble and that she did not think it was that important.

A.B. informed the court that she exited the locker room and met Battice, who was then her boyfriend; he was waiting outside the gymnasium with Salazar, Lofton and Jones. She testified that she knew Battice, Lofton and Salazar, but that she did not recognize Jones. However, during cross-examination it was established that in a statement made to police days after the incident, A.B. had stated that she knew Jones from the neighborhood.

After conferring for a short period of time, the victim and Battice reentered the school followed by Jones, Salazar and Lofton. Lofton testified that Battice asked him to open the auditorium with the pass-key he had from his job as a school janitor, so Battice and A.B. could have sexual intercourse. Lofton told the court that at that point Battice informed Jones, Salazar and him that A.B. would "give [them] sex."

A.B. and the four accused entered the auditorium. Battice took her backstage into a storage area where the two engaged in consensual sexual intercourse. Lofton informed the court that he,

Jones and Salazar waited in the auditorium's seating area while Battice and A.B. engaged in sexual intercourse, after which the victim dressed herself, gathered her belongings and prepared to leave. Contemporaneously, the three from the auditorium appeared backstage, and along with Battice, loosely surrounded A.B. When she made an attempt to leave, Salazar confronted her, asked her where she thought she was going, and began to remove her clothing. When she resisted, Battice joined Salazar and the two disrobed her, despite her resistance. Salazar, Jones and Battice pulled her to the ground and held her there. Jones then removed his clothing and attempted to penetrate her vagina with his penis. A.B. testified that she attempted to prevent penetration by struggling and wriggling on the ground.

Salazar and Battice then pulled A.B.'s legs behind her head, and Jones penetrated her vagina with his fingers. She testified that soon thereafter Salazar and Battice did so as well. While Salazar attempted to have the victim perform fellatio, Battice attempted to penetrate her vagina. She prevented this by kicking him in the head. In retaliation, Battice "jammed" his hand into her vagina.

Lofton and Battice then departed, leaving Jones and Salazar with A.B. The two then restrained the victim by putting her in a "sandwich" with Jones behind, attempting to sodomize her, and Salazar in front inserting his penis in her vagina. They stopped only after A.B. heard someone enter the auditorium, and she loudly asked who was there. The three dressed and exited the school. She admitted that Jones walked her home.

Upon arriving home at 9:40 p.m., A.B. did not inform her mother of the assault. She explained that she did not say anything because her mother was already angry that she came home late, and she feared that news of the assault would only anger her mother more.

The next day A.B. told a counsellor at school what happened the previous evening. He instructed her to write down the events, which she did. Her report related the events described above, except that she omitted reference to Battice as one of her attackers because at that time she did not want to get him in trouble. She later informed the police that Battice participated in the assault.

Dr. Teresita Hogan, an expert in the area of emergency medicine, testified for the State that she examined A.B. on January 26, 1989. Dr. Hogan stated that the victim's body contained the types of abrasions and hematomas which would be consistent with vaginal penetration by fingers and scratches from fingernails. Dr. Hogan also informed the court that the "rug burn" abrasions on the victim's back were also consistent with bruises and scrapes that would result

from being roughly dragged along a carpet, such as the one in the storage area of the auditorium where A.B. testified she was assaulted.

Officer Robert Mayer of the Evanston police department testified for the State and related the substance of an interview he had with Jones on February 2, 1989, in which Jones essentially corroborated the testimony of A.B. Jones confessed that while the victim struggled beneath him, he attempted to sodomize her. He also admitted that he, along with the other three, digitally penetrated the victim's vagina.

Officer Robert Hendricks testified to a conversation he had with Salazar on January 27, 1989, during which Salazar admitted that he met A.B. at her locker, took her into the men's washroom, and once in a bathroom stall, he attempted to undress her, despite her protestations. He confessed to Hendricks that he had made a concerted effort to persuade A.B. to engage in sexual intercourse with him, and that his efforts were rebuffed. He also told Hendricks that in the auditorium, he participated in removing the victim's clothes and that his penis came into contact with the victim's sexual organs. He denied penetrating the victim's vagina with his fingers.

The court found Jones and Salazar guilty of two counts of criminal sexual assault, and after expressly considering factors in mitigation and aggravation, sentenced both defendants to five years in the custody of the Illinois Department of Corrections.

I

In Jones' first allegation of error, he argues that the court improperly excluded evidence that he had observed the victim engage in sexual conduct with Battice one month before the assault at issue here. He asserts that either his voyeurism on the earlier occasion falls within the exception to the rape shield statute or that if it did not, then the statute as applied unconstitutionally interfered with his right to confront his accuser and present his defense. We reject both of these contentions and affirm the trial court's ruling to exclude as evidence the victim's irrelevant prior sexual conduct.

A

Section 115—7 of the Illinois Code of Criminal Procedure of 1963, commonly referred to as the rape shield statute, provides in pertinent part: "In prosecutions for ***criminal sexual assault *** the prior sexual activity or the reputation of the alleged victim is inadmissible except as evidence concerning the past sexual conduct of the alleged victim with the accused." (Ill. Rev. Stat. 1989, ch. 38, par. 115—7.) Jones contends that his voyeurism on the earlier occasion constituted

"past sexual conduct of the alleged victim with the accused." (Ill. Rev. Stat. 1989, ch. 38, par. 115—7.) In support of this argument, Jones, in his brief, asserts: "the statute prohibits the introduction of evidence of the complainant's sexual history 'unless it relates to the relationship between the victim and the accused.'" (Quoting *People v. Sandoval* (1990), 135 Ill. 2d 159, 171, 552 N.E.2d 726, 731.) He concludes that he had a "relationship" with the victim because he watched her engage in consensual intercourse with Battice and that this "relationship" with the victim properly falls within the exception to the statute. In response, the State maintains that the statute prohibits introduction of the prior sexual conduct between Battice and the victim even if Jones watched the acts; it does not address Jones' argument that voyeurism could amount to prior sexual conduct with the victim.

No Illinois court has, as yet, construed the provisions of the rape shield statute at issue here. Jones' insinuation to the contrary, namely, that the supreme court has construed "past sexual conduct" for the purposes of the rape shield statute, does not survive scrutiny. He implies that in *Sandoval*, the court held that prior sexual conduct amounts merely to a "'relationship between the victim and the accused.'" (Quoting *Sandoval*, 135 Ill. 2d at 171, 552 N.E.2d at 731.) But, the *Sandoval* court simply had no cause to construe "past sexual conduct"; Jones unabashedly quotes the court's language out of context in a Procrustean attempt to reach the desired conclusion.

In *Sandoval*, the defendant was convicted of two counts of criminal sexual assault, as well as one count of battery, for repeated acts of nonconsensual anal and oral sodomy with his former girl friend. At trial, the victim admitted that she had engaged in anal intercourse in the past with the defendant, but stated that she had never willingly submitted to it with anyone other than him. Sandoval attempted to impeach that statement with evidence that she had participated in anal sex with others. The trial court refused to allow the impeachment, citing the rape shield statute. Ill. Rev. Stat. 1987, ch. 38, par. 115—7.

Clearly, given the facts of the case, *Sandoval* did not address the proper construction of "past sexual conduct" for the purposes of the rape shield statute, as no party contested the proposition that anal intercourse would constitute past sexual conduct. Instead, at issue there was the procedural question of whether the rape shield statute prevented the prosecution as well as defendant from introducing evidence of the victim's prior sexual history. (*Sandoval*, 135 Ill. 2d at 171, 552 N.E.2d at 731.) The court used the general language—"a relationship between the victim and the accused"—only to illustrate

that the rape shield statute applies to the State as well as the defendant.

Consequently, we consider the issue of what constitutes "past sexual conduct" as that term is used in section 115—7 on a clean slate, in which task we find guidance in the legislature's definition of "sexual conduct" as contained elsewhere in the Criminal Code. That term, as an element of certain of the offenses proscribed in sections 12—13 though 12—18 of the Criminal Code, is defined as follows: " '[s]exual conduct' means any intentional or knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus or breast of the victim or the accused *** for the purpose of sexual gratification or arousal of the victim or the accused." (Ill. Rev. Stat. 1989, ch. 38, par. 12—12(e).) While the legislature's application of this definition to sections 12—13 through 12—18 may suggest an impediment to our considering sections 115—7 and 12—12 as being *in pari materia*, we perceive no difficulty in interpreting the two provisions as being consistent as to meaning.

"The primary rule of statutory construction is to ascertain and give effect to the intention of the legislature ***." (*Metropolitan Life Insurance Co. v. Washburn* (1986), 112 Ill. 2d 486, 492, 493 N.E.2d 1071, 1074, citing *Franzese v. Trinko* (1977), 66 Ill. 2d 136, 139-40, 361 N.E.2d 585, 586; see also *People v. Boykin* (1983), 94 Ill. 2d 138, 141, 445 N.E.2d 1174, 1175 ("The cardinal rule of statutory construction, to which all other canons are subordinate, is to ascertain and give effect to the true intent and meaning of the legislature. [Citations]).) And to ascertain the legislature's intent, we must first look to the language of the statute that we are attempting to construe. (*Castaneda v. Illinois Human Rights Comm'n* (1989), 132 Ill. 2d 304, 318, 547 N.E.2d 437, 444.) If the court cannot divine the meaning of a statute from its plain language, we may infer the meaning of the legislation from its purpose or the evils the enactment was intended to remedy. (*Castaneda*, 132 Ill. 2d at 318, 547 N.E.2d at 444; *American Country Insurance Co. v. Wilcoxon* (1989), 127 Ill. 2d 230, 239, 537 N.E.2d 284, 288.) To clarify an ambiguity in the language, we may also rely on the legislative history of the act in question. *In re Marriage of Logston* (1984), 103 Ill. 2d 266, 279, 469 N.E.2d 167, 172.

Looking only to the language of section 115—7, we cannot say that it commands any particular construction of "past sexual conduct." A broad construction, which would include voyeurism, would be as reasonable as a narrow one; in such a case, since the language of the statute does not manifest the one true construction of the phrase "prior sexual conduct," we look to the statute's purpose and the evils it was enacted to remedy.

The legislative history of our rape shield statute (Ill. Rev. Stat. 1989, ch. 38, par. 115—7) demonstrates that the legislature had a twofold purpose for its enactment. First, to protect the victims of sexual assaults from the ignominy of having their irrelevant yet embarrassing prior sexual habits paraded before them at a defendant's trial. Second, the legislature reasonably concluded that if victims were free from the concern that certain episodes in their sexual history might be dredged up, they would be more forthcoming about sexual abuse, thereby promoting more effective law enforcement. See *People v. Ellison* (1984), 123 Ill. App. 3d 615, 463 N.E.2d 175 (providing a comprehensive analysis of the legislative history of the rape shield act); see also Loftus, Comment, *The Illinois Rape Shield Statute: Privacy at any Cost*, 15 J. Marshall L. Rev. 157 (1982) (same).

Given the clear dual purpose of the act, we hold that the exception to the act must be construed as narrowly, yet as fairly as possible. A broad construction, such as the one Jones proposes, would defeat the legislative intent that motivated enactment of the statute by potentially exposing victims to harassment and embarrassment even in instances where, as here, she may not have been cognizant that another was observing her sexual activity. Jones argues on appeal that the victim knew that he spied upon her while she performed fellatio on Battice because Battice laughed and called Jones over to watch. However, the record indicates only that Battice laughed, not that Battice called to Jones by name or that the victim knew of Jones' presence. We therefore decline to adopt, as we must, a construction which would frustrate the General Assembly's goals of protecting the victims of criminal sexual conduct and promoting effective law enforcement.

Accordingly, we consider the narrow definition of "sexual conduct" contained in section 12—12(e) (Ill. Rev. Stat. 1991, ch. 38, par. 12—12(e)) to be appropriate in the context of the rape shield statute. Consistent with that definition, we hold that "prior sexual conduct" between the victim and the accused will be admissible only where there is a "[an] intentional or knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus or breast of the victim or the accused *** for the purpose of sexual gratification or arousal of the victim or the accused." Ill. Rev. Stat. 1991, ch. 38, par. 12—12(e).

■ Applying section 12—12(e)'s definition of sexual conduct to the case at bar, we hold that Jones' voyeurism does not fall within the exception to the rape shield statute. That definition plainly calls for some physical interaction between the victim and the accused. Here,

Jones alleges only that he viewed the victim while she physically interacted with a third person. Consequently, Jones did not participate in any "past sexual conduct" with the victim within the meaning of that term as contained in the rape shield statute; the trial court therefore correctly excluded the evidence.

## B

Jones next argues that if his voyeurism does not fall within the exception to the rape shield statute (Ill. Rev. Stat. 1989, ch. 38, par. 115—7), then the statute as applied impermissibly interfered with his sixth amendment right to confront his accuser and present a defense. Jones offers the self-evident argument that a statute which is inconsistent with a constitutional right must yield, or that a court must construe the statute in a way which gives effect to the constitutional right. He contends that the trial court, by excluding the evidence of the victim's earlier sexual encounter with Battice, prevented him from establishing his defense that the victim consented to the encounter with him as well. Moreover, he claims that the excluded evidence was essential to impeach her as to her testimony that she did not know Jones prior to the incident at issue here.

In *People v. Sandoval* (1990), 135 Ill. 2d 159, 552 N.E.2d 726, our supreme court addressed an argument very much like the one advanced here. There, the defendant sought to introduce evidence of prior sexual conduct to impeach the victim's assertion that prior to the sexual assault at issue in the case, she had engaged in anal intercourse only at the behest of the defendant. The defendant offered to produce other males who would contradict that assertion and would state under oath that they had sodomized her in the past at her urging. The trial court in *Sandoval* disallowed the proposed impeachment, invoking the rape shield statute. On appeal, the supreme court held that the trial court did not violate Sandoval's confrontation rights secured by the Illinois Constitution (Ill. Const. 1970, art. I, § 8) and the United States Constitution (U.S. Const., amend. VI).[1] The court analyzed the constitutionality of the rape shield statute by placing it within the framework set forth in *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105.

[1]Article I, section 8, of the 1970 Illinois Constitution provides: "In criminal prosecutions, the accused shall have the right *** to meet the witnesses face to face ***." Ill. Const. 1970, art. I, § 8.

The sixth amendment to the United States Constitution made applicable to the States through the fourteenth amendment in *Pointer v. Texas* (1965), 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065 similarly states: "In

In *Davis*, the United States Supreme Court held that an otherwise valid State evidentiary law runs counter to the sixth amendment when it does not permit the defendant to show bias, prejudice or motive which may affect the witnesses' testimony. (*Davis*, 415 U.S. at 316, 39 L. Ed. 2d at 353-54, 94 S. Ct. at 1110.) The *Sandoval* court found that *Davis* did not grant a defendant a license to harass, abuse or generally attack his accusers (*Sandoval*, 135 Ill. 2d at 174-75, 552 N.E.2d at 733); it only ensures that the defendant will be able to confront his accuser "where the confrontation is both relevant and based on a showing of bias, prejudice or motive." *Sandoval*, 135 Ill. 2d at 174-75, 552 N.E.2d at 733.

Jones asserts that he sought to offer this evidence precisely for these reasons, and argues that the victim here had several motives to accuse Jones and Salazar falsely. Jones suggests that she feared her mother's reaction to her sexual experiences and that she was attempting to protect her boyfriend, Battice.

We reject Jones' constitutionally based argument for several reasons. First, the prior sexual encounter with Battice that Jones watched is not legally or even logically relevant to the possible motive that the victim feared her mother's reaction. A fact is legally relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (*People v. Monroe* (1977), 66 Ill. 2d 317, 322, 362 N.E.2d 295, 297.) Here, the fact that Jones observed the victim having consensual intercourse with a codefendant approximately one month prior to the sexual assault at issue here fails to shed any light on the issue of whether the victim feared her mother would castigate her for having sexual intercourse on the night of the assault.

The defendant attempts to analogize this case to *People v. Gray* (1991), 209 Ill. App. 3d 407, 568 N.E.2d 219, *appeal denied* (1991), 139 Ill. 2d 600, 575 N.E.2d 919, where the appellate court held that the defendant's confrontation rights superseded the State's interest in protecting the victim under the provisions of the rape shield statute and that therefore the defendant should have been allowed to question the victim on her fear of being pregnant by another man.

However, *Gray* presents a situation where the prior sexual activity was relevant to the criminal assault being tried. There, the victim admitted outside the jury's presence that in the summer of 1985 she feared she was pregnant by her friend, Keith; that her

---

all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him ***." U.S. Const., amend. VI.

mother did not initially know about her relationship with Keith; and that when the victim's mother merely saw her with Keith, she was punished. (*Gray*, 209 Ill. App. 3d at 411, 568 N.E.2d at 222.) The trier of fact there could reasonably decide that the victim invented the sexual assault, given her fear of her mother's previously demonstrated wrath, which would only be inflamed by the pregnancy.

This case shares some superficial similarities with *Gray*. Both cases involve an allegation that the victim falsely accused the defendant of sexually assaulting her. Additionally, the defendant in *Gray* and Jones here argue that fear of reprisal from the victims' respective mothers motivated the false accusation. Those two facts alone, however, did not render the past sexual history of Gray's victim relevant. It derived its relevance only from the fact that she feared she was pregnant, and, therefore, her mother would *necessarily* discover that she was sexually active.

The feared pregnancy in *Gray* provided the logical basis from which a trier of fact could reasonably infer that the victim invented the alleged sexual assault. That predicate is absent here. Jones does not allege that the victim feared pregnancy; nor does he present any other plausible reason to demonstrate why the victim suddenly feared her mother would learn of the group sexual encounter in the high school auditorium but not the one she had a month earlier with Battice. More significant, nothing logically links the victim's prior instance of sexual conduct with the alleged motive to lie. Jones' argument, when stripped bare, advances the theory that a defendant may circumvent the rape shield statute and explore the victim's prior sexual history whenever he asserts that the victim has any motive to lie, which is, of course, absurd.[2]

Jones also asserts that the excluded evidence was admissible because it was necessary to impeach the victim's testimony that she did not know him prior to the sexual assault. However, as stated earlier, the record does not establish that the victim knew *anyone* watched her with Battice, much less that she knew that Jones, in particular, watched. Consequently, exploring the victim's past sexual incident with Battice would not impeach her testimony that she did not know Jones before the assault.

---

[2]The defendants' asserted alternative motive that the victim falsely accused Jones and Salazar to protect her one-time boyfriend Battice is equally absurd given that the victim ultimately implicated Battice at the trial of Jones and Salazar. Moreover, if the victim truly wanted to protect Battice, her best approach would be not to tell anyone of her sexual encounter with the four men. The least effective means would be to accuse Jones and Salazar falsely, giving them the incentive to implicate Battice.

■ Moreover, and more important, Jones successfully impeached by other means the victim's direct testimony that she did not know him prior to the assault. On cross-examination, counsel for Jones confronted her with a statement she made to the police two days after the incident wherein she admitted that she recognized Jones from the neighborhood. Jones gained as much benefit as possible from the victim's inconsistent testimony without allowing him to delve into the victim's irrelevant prior sexual experiences. The right to confront one's accusers does not include the right to explore the irrelevant prior conduct of a victim. Accordingly, we hold that the rape shield act, as applied, did not violate Jones' right to confront his accusers or to present a defense.

## II

Defendants' final contention is that the trial court erred in sentencing them. They ask this court to compare their five-year sentences to the sentence given to their codefendant Battice. Battice pled guilty to unlawful restraint and misdemeanor criminal sexual abuse and the court placed him on 30-months' probation. The defendants argue that the disparity in sentencing between Battice and them violates due process in view of their shared culpability and the fact that Battice allegedly served to instigate the sexual assault. In the words of the defendants: "[Battice] 'gave his girl friend [the victim] away.' But for [Battice], the defendants may have just gone 'home that afternoon.' " In addition, defendants seem to suggest that the trial court did not consider the defendants' mitigating factors prior to passing sentence.

The State responds that the trial court did not abuse its discretion by sentencing Jones and Salazar to five years' incarceration. In support of its contention, the State points out that under the Unified Code of Corrections, the statutory minimum sentence for criminal sexual assault, a Class 1 felony, is four years. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(4).) The State concludes that the trial court considered the factors in mitigation but determined that given the heinous nature of the crime, the aggravating factors outweighed those in mitigation. The State therefore maintains that the court did not err in imposing a sentence one year over the minimum allowable time.

■ After applying the appropriate standard of review, we are compelled to agree with the trial court on the appropriateness of the sentences it imposed. Our supreme court has held consistently that the imposition of sentence is within the trial court's discretion and that a sentence imposed will not be altered by a reviewing court

unless the trial court abused its discretion. (See *People v. Ashford* (1988), 121 Ill. 2d 55, 88, 520 N.E.2d 332, 346; *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, 883; *People v. Butler* (1976), 64 Ill. 2d 485, 356 N.E.2d 330.) Moreover, a sentencing court's decision is cloaked with a presumption of correctness. *People v. Choate* (1979), 71 Ill. App. 3d 267, 275-76, 389 N.E.2d 670, 676.

A trial court abuses its discretion when it sentences similarly situated defendants to grossly disparate punishments. (*People v. Kline* (1981), 99 Ill. App. 3d 540, 553-54, 425 N.E.2d 562, 571-72, *rev'd on other grounds* (1982), 92 Ill. 2d 490, 442 N.E.2d 154; *People v. Bares* (1981), 97 Ill. App. 3d 728, 738, 423 N.E.2d 538, 545.) Fundamental fairness commands that a court not punish one defendant more severely than his equally culpable codefendant, absent a valid reason. *People v. Martin* (1980), 81 Ill. App. 3d 238, 245, 401 N.E.2d 13, 18.

At first blush it would appear that Battice, Jones and Salazar are equally culpable. They all participated in the sexual assault of the victim. Furthermore, Battice, according to defendants' brief, instigated the episode. However, the defendants' argument ignores the fact that Battice and the appellants here are not similarly situated. Battice pled guilty to charges of misdemeanor criminal abuse, a Class A misdemeanor and felony unlawful restraint, a Class 4 felony. (Ill. Rev. Stat. 1989, ch. 38, pars. 12—15, 10—3.) Jones and Salazar were convicted of criminal sexual assault, a Class 1 felony. Ill. Rev. Stat. 1989, ch. 38, par. 12—13.

We have repeatedly held that a negotiated plea does not serve as a valid basis of comparison for a sentence imposed after trial. (*People v. White* (1985), 134 Ill. App. 3d 262, 283, 479 N.E.2d 1121; *People v. Bennett* (1980), 90 Ill. App. 3d 64, 412 N.E.2d 1001.) The defendants cite two cases in which the reviewing court reduced disparate sentences between codefendants where the lesser sentences were the product of a negotiated plea. (*People v. Franklin* (1987), 159 Ill. App. 3d 923, 512 N.E.2d 1318; *People v. Jackson* (1986), 145 Ill. App. 3d 626, 495 N.E.2d 1207.) Defendants, although relying on *Franklin* and *Jackson*, ignore the one aspect of those cases which renders their decisions inapplicable to the facts *sub judice*. In both cases, the defendant who received the lesser sentence nevertheless pled guilty to the same offense as the appellant.

In *Jackson*, the appellant received an 80-year sentence after being found guilty of armed robbery, murder and conspiracy to commit murder, while his codefendant pled guilty to armed robbery and

murder and received a 30-year sentence.[3] (*Jackson*, 145 Ill. App. 3d at 632-33, 495 N.E.2d at 1213.) In *Franklin*, the trial court imposed a 15-year sentence on Franklin for the manufacture of a controlled substance. (*Franklin*, 159 Ill. App. 3d at 933, 512 N.E.2d at 1320.) His codefendant, as the result of a negotiated plea, received six years for the same offense. *Franklin*, 159 Ill. App. 3d at 933, 512 N.E.2d at 1320.

Since the codefendants in *Franklin* and *Jackson* were charged with the same crimes, they were "similarly situated." The reviewing courts there had a valid basis of comparison. Here, in contrast, the disparate sentences were the result of the charges the State chose to bring against the respective parties; defendants were not similarly situated, and thus, the trial court did not abuse its discretion. Accordingly, the decision of the trial court is affirmed.

Affirmed.

McCORMICK, P.J., and DiVITO, J., concur.

---

[3]The appellate court also set aside Jackson's conviction for conspiracy to commit murder because it violated section 8—5 of the Criminal Code of 1961. (*Jackson*, 145 Ill. App. 3d at 647, 495 N.E.2d at 1223, citing Ill. Rev. Stat. 1981, ch. 38, par. 8—5.) Thus, both Jackson and his codefendant were sentenced for murder and armed robbery.